# The Ardesco Oil Company *versus* Richardson and Tack.

1. A company leased a leaking oil-tank, made with iron sides and wooden bottom, the lessee agreeing, in lieu of rent, to put it "in perfectly good repair." This did not require more than putting it in as good condition as it could be made with a wooden bottom.

2. "Repair" means to restore to its former condition, not to change either the form or material.

3. Evidence of declarations of the president of the company that the cost of repair would not exceed $500 was admissible for the purpose of showing that the parties did not intend an iron bottom, which would cost several thousand dollars.

4. Evidence that the president was present whilst the repairs were going on, and expressed his satisfaction with them, was admissible.

5. Evidence of the amount expended in making the repairs was admissible as pertinent to the question of the breach of contract and as to damages.

November 6th 1869. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

[Ardesco Oil Co. v. Richardson.]

Error to the District Court of *Allegheny county:* No. 61, to October and November Term 1869.

The Ardesco Oil Company, on the 31st of January 1868, instituted an action of assumpsit against Samuel Richardson and Theodore E. Tack for an alleged breach of a contract, of which the parts material to this case are as follows:—

" Articles of agreement, made this 22d day of January 1866, between The Ardesco Oil Company of the first part, and Samuel Richardson and Theodore E. Tack of the second part, witness: That the said party of the first part hereby lease and let to the said parties of the second part, one iron tank, situated on the premises of the Ardesco Oil Company, in McClure township, Pennsylvania, for the purpose of storing crude petroleum—the capacity of said. tank being about 13,000 barrels, more or less—for the term of two years, from the 22d day of January 1866; and in lieu of rent, the parties of the second part agree to put the tank in perfectly good repair, and to leave it in the same condition at the expiration of the lease." * * * "And it is' further agreed that the party of the first part shall at all times (if there is not sufficient oil in the tank) have the liberty of pumping water into said tank to such an amount as to keep it safe in times of high water, which shall be done without charge to the parties of the second part."

The breach of the contract alleged was that the defendants did not put the tank in good repair.

There was very little evidence returned with the paper-book. It appeared by the statements of the respective parties in their paper-books, that the plaintiffs were owners of an extensive oil-refining establishment on the Ohio river, and in 1865 had erected at their works a large tank of the capacity of 13,000 gallons made with iron sides and wooden bottom for storing crude petroleum. Before it was used a rise in the river forced the bottom up, and the tank became unfit for use. The tank being in this condition it was leased to the defendants by the above articles. It is the custom to put water into tanks with wooden bottoms, because the water remaining at the bottom prevents leakage of the oil. Shortly after the lease the defendants employed a tank-builder who repaired the bottom of the tank at cost of about $1000. The tank continuing to leak, another tank-builder put in an entirely new wooden bottom, which made the tank as secure as it could be made by a wooden bottom; but both the tank-builders were of opinion, that owing to the position of the tank and the nature of the ground, no wooden bottom could be put in that would not leak. The tank continued to leak, the leakage varying from 10 to 180 barrels per day. The plaintiff's evidence was that it always leaked more than a tank " in good repair" should leak. The defendant's evidence by experts was that the repairs were as thorough as time

and skill could make them. The defendants in their paper-book stated that by their uncontradicted evidence no oil had been lost from the tank whilst in the possession of themselves or their successors. On the trial the defendants offered to show that after they took possession and were about to make the repairs, Mr. O'Hara, the president of the company, said that their cost would not exceed from $200 to $500, as tending to show that the plaintiff did not intend by the agreement to exact the addition of an iron bottom costing several thousand dollars; also, to prove that Mr. O'Hara was present several times whilst the repairs were in progress, saw the work going on, and expressed his entire satisfaction with the repairs as they were being made; also, the amount expended by defendants in repairing the tank, for the purpose of showing performance in good faith of the provisions of the contract. These offers were all objected to by the plaintiffs, admitted by the court, and several bills of exception sealed.

The following are points submitted by plaintiff, and their answers:—

"4. The opinion of either party at the time the contract was made, or afterward, as to what repairs were necessary in order to put the tank in perfectly good repair, or what such repairs would probably cost, is irrelevant, and should not be considered by the jury."

Answer: "The estimate put upon the necessary repairs by the president of the company, can only be considered by the jury as tending to show his understanding of the contract, as to whether iron or wood was to be used in making the repairs."

"6. In regard to the alleged breach of defendants' contract, the only inquiry of the jury should be, did the defendants put the tank in perfectly good repair, and leave it in such condition at the end of their lease? Any work they may have done, or expense they may have incurred, in their efforts to repair the tank, have no bearing on this question, if the jury find that in point of fact the tank was not in perfectly good repair at the end of the lease."

Answer: "We cannot instruct the jury as requested in this point, without some qualification. It is true, that if nothing but an iron bottom would put this tank in the condition required by the terms of the contract, then all the labor performed, and expenses incurred by them, would be of no avail, and could not be considered by the jury in estimating the damages. But if a wooden bottom could be made so as to meet the requirements of the contract; and if this bottom was not sufficient, then the question would arise, would, or would not, all the material put in by the defendants have to be taken out, and new material procured and put in, or could this bottom be made complete, so as to answer the demands of the lease, by adding thereto other materials, and carrying out and completing the work done by them? If this could be done, then

[Ardesco Oil Co. *v.* Richardson.]

the plaintiffs would be entitled only to such damages as would so complete the work."

The court (Hampton, P. J.) recapitulated the evidence and charged:— * * *

"The plaintiff's counsel contends that unless a wooden bottom can be made as tight as an iron bottom, the defendants were bound to put in one of the latter material.

"The counsel for the defendants insists that they were only bound to make as good a job as could be made, using wood, instead of iron, as the material, and that they had done so.

"There is one question of fact and of law in this case. The law of this contract is, that the defendants were bound to put the tank in perfectly good repair, and to leave it in the same condition at the expiration of the lease—and the question of fact is, have they done so? The parties themselves made the law, by the very terms of the contract. The words 'perfectly good repair,' do not mean that any particular material must be used. Iron, brass, copper, zinc, lead, wood or stone may be used, if either will make such a job as was contemplated by the parties when they entered into this agreement. Now, what do they mean by the terms employed? This tank had a wooden bottom at the time—many others had the same kind—but some had iron bottoms. The latter material has become, according to the testimony of an experienced tank-builder, much more common now than when this lease was made. We have no evidence, except the terms of the contract, that either party contemplated a change of the material from wood to iron—nor does it seem to me very likely, if it had been thought necessary by the plaintiff to make such a change, that this contract would have been silent on the subject. The words here are to receive a reasonable construction—and what is that? Why, that the character of the materials and workmanship must be of such a quality—so adapted to the purpose for which these repairs were designed, as, in the estimation of men experienced in this business, would be presumed perfectly good. Every branch of business must be judged of by the rules of the trade, and the common sense of mankind. If a landlord should lease to a tenant a house with a shingle roof, which leaked badly, and bind the tenant to put the house in perfectly good repair, would it be the understanding of the parties that he was to repair the roof with the same kind of materials, although it might not be as tight, or as warm, as permanent, or as secure against fire, as a slate-roof?

"If, therefore, this bottom was made of such material and workmanship as to constitute it a perfectly good job, in the sense in which that phrase is legitimately used by men skilled in that branch of business, and if the same was so left, then the plaintiff cannot recover, and your verdict should be for the defendants. But if you should find otherwise, then your verdict should be for the

plaintiff, for such sum as would put the repairs in that condition. You will take all the evidence into your careful consideration, and will render such a verdict as will be just under the law as laid down by the court."

The verdict was for the defendants. The plaintiff took a writ of error and assigned for error the admission of the evidence objected to and the instructions of the court.

*H. Burgwin,* for plaintiffs in error.

*G. Shiras, Jr.,* for defendants in error.

The opinion of the court was delivered, November 22d 1869, by

READ, J.—The plaintiffs were the owners of a large refining works on the Ohio river, and had erected on their premises an oil tank for storing crude petroleum in the spring of 1865. It had iron sides and a wooden bottom, and held about 13,000 barrels of oil. Before it had been used by the plaintiffs, by a rise in the river, and the water getting under it, the bottom was injured and it could not be used without repairs. The ground on which it stood had been selected by the plaintiffs, and it turned out from its position and the nature of the ground it would leak more than such a tank when in good repair would leak. If the plaintiffs had undertaken to repair it they would naturally have done so by repairing the injury to the wooden bottom by strengthening it and putting it in the same condition as nearly as possible as it was when completed before the rise in the river. This they would have considered as putting the tank in perfectly good repair.

Instead of doing this themselves, on the 22d of January 1866 they leased it to the defendants for two years, and in lieu of rent the defendants agreed " to put the tank in perfectly good repair and to leave it in the same condition at the expiration of the lease." All that this would naturally mean, would be at the outside to put a new wooden bottom in, and then it would be as good as it ever was when originally finished for use by the plaintiffs. Repair means to restore to its former condition, not to change either the form or the material. If you are to repair a wooden building you are not to make it brick, stone or iron, but you are to repair wood with wood.

In a suit therefore upon this agreement there would be two questions to be tried : 1st, was there a breach ? and 2d, what are the damages sustained by the plaintiffs ? The evidence on both sides of course would relate to these two points.

The plaintiffs' theory was that perfectly good repair meant that if this could not be effected except by putting in an iron bottom, the defendants were bound to put in an iron bottom and thus

[Ardesco Oil Co. *v.* Richardson.]

make it a complete iron tank, when the original tank which was the subject of repair was intended by the plaintiffs to have only a wooden bottom, and was so built by them and ready for use but never tested by the plaintiffs, but believed by them to be entirely fitted for the purpose of storing crude petroleum. The lease was in fact of an iron tank with a wooden bottom.

The leak complained of was of water not oil, for in such tanks water is pumped in to prevent the leakage of the oil. The ground for alleging a breach of the agreement was the water leakage, and the material point of time in this respect was at the expiration of the lease when it was to pass into the possession of the plaintiffs.

The defendants immediately proceeded, at an expense of about $1000, to repair the bottom then in the tank. This proving insufficient, they employed another experienced tank-builder, who at an additional expense of about $2000 put in at their request an *entirely new bottom* on top of the first one, and made it as tight and secure as it could be made with a wooden bottom.

The evidence of the declarations of Mr. O'Hara and of his presence whilst the repairs were going on, as disproving the iron bottom theory and upon the question of damages was properly admitted, and so also the evidence of the repairs actually made, and their expense, was entirely pertinent not only on the question of any breach of the agreement but of the damages alleged by the plaintiffs.

Upon examining the charge and the answers to the points assigned for error we do not find any error. The court explained the law and properly left the finding of the facts to the jury.

The counsel for the plaintiffs in error has not given the evidence bearing upon his exceptions and points, to enable us to judge of their applicability. To answer some of the points as requested by the plaintiffs would have been positive error, and in others the court were called upon to decide matters of fact, which is the province of the jury.

The error of the plaintiff's contention was that he asked for more than the agreement called for.

Judgment affirmed.

SHARSWOOD, J., dissented as to the admission of O'Hara's declarations, and the answer of the court to the 4th point.