Sweet, Appellant, v. Grange Mut. Cas. Co., Appellee█

[Cite as Sweet v. Grange Mut. Cas. Co. (1975), 50 Ohio App. 2d 401.]

(No. 607—Decided June 30, 1975.)

*Messrs. Mason, Mason & Fridline,* for appellant.
*Messrs. Lutz & Oxley,* for appellee.

Putman, J. In this case we hold that the trial court should have sent a claim for punitive damages for a claimed tort arising in conjunction with a claimed wilful breach of contract to the jury for their determination of the issues of whether such a breach occurred and if so the amount of such damages.

Originally, the plaintiff-appellant, hereafter referred to as Sweet, filed a complaint containing two counts against the defendant-appellee, hereafter referred to as Grange, the insurer of Sweet's 1972 Dodge automobile.

The first count alleged in substance that Grange had issued a $100 deductible automobile collision policy to Sweet to cover the automobile and that on May 14, 1973, the automobile was completely demolished and could not be repaired for less than the value thereof; that the value of the automobile was $3,300 on the date of the accident; that Grange refused to pay Sweet for the loss suffered by him or to replace the car which was accumulating storage

charges at the rate of $1.50 per day. The amount claimed for storage as of June 18, 1973, was $52.50.

The second count of the complaint alleged that Sweet was a totally disabled veteran who had no income other than from disability benefits, that Grange knowing of his condition informed him that if he, Sweet, would not accept Grange's offer of "restitution," that Grange would no longer pay storage charges for the automobile; that Grange would not pay for the damage to the automobile based on the estimates submitted by Sweet; that Grange's offer of settlement was that they would "cut plaintiff-appellant's car in two and clip on the front part of said car to the rear part of another car"; that Sweet had mortgage payments of $103.72 per month on said automobile, and that "with knowledge of the plaintiff's financial and physical condition and by threats and duress, the said defendant has attempted to force the plaintiff to accept an alleged motor vehicle composed of two half cars."

Sweet demanded judgment for $3,250.50 compensatory damages, plus future expenses incurred for storage and also for attorney fees, and $2,500 in punitive damages for the "malicious conduct" of the defendant. Grange filed its answer and third party complaint (against the mortgagee of said automobile) admitting that the policy of insurance was effective at the time of the loss and alleging in effect that Sweet had refused to accept payment of his loss as such term is defined in the insurance agreement, and that he incurred unreasonable storage; that Grange had at all times been ready to pay the loss alleged by said party to be $1,357.72 plus $30.00 in storage.

In answer to count two, Grange denied both the truth and the relevance thereof. The issues came on to be tried before a jury. At the conclusion of all testimony, the court directed a verdict on liability in favor of Sweet as to count one and sent the issue of damages to the jury which returned a verdict of $3,500. Grange appeals from the judgment, assigning nine errors, which we overrule. The court directed a verdict for Grange as to count two.

Sweet appeals from the latter, separately assigning as

error that it is against the manifest weight of the evidence and contrary to law. Correctly speaking, the phrase contrary to the manifest weight of the evidence is not appropriate to the appellate review of such orders, wresting cases from the consideration of a jury. We conclude that the judgment was contrary to law.

We now recite the evidence which entitled Sweet to get to the jury on the question of punitive damages. Grange admitted that it had insured Sweet against damage by collision to his 1972 Dodge automobile and that the policy was in effect when the automobile was damaged in an accident on May 14, 1973. Following the accident, Sweet obtained three estimates from local garagemen, all indicating that the automobile was a total loss. Sweet spoke with Gerald Tucker, the Ashland agent for Grange, who indicated there wouldn't be any problem, and also to Bruce McClellan, an adjustor, who "thought it was totalled."

Sweet testified that he wasn't making any progress and was advised to call Mr. Shied of the Mansfield office of Grange. When he called Shied, Sweet was told that Grange wanted to put a "clip" on the car. The conversation was to the effect that Grange would fix the car to their satisfaction, not to Sweet's and that if Sweet didn't like it— "tough." Shied also said he would send a check for $1,000 and Sweet could take the car anywhere he wanted to get it fixed. Shied also used foul language in the conversation and "hung up" on Sweet.

Exhibit N is a letter written by Shied to the effect that Grange would no longer be liable for storage if their price for repairing the automobile wasn't accepted by Sweet. This letter followed some negotiation with counsel for Sweet.

Shied, on cross-examination, finally admitted that he informed Sweet he would have to accept a "clip" on his automobile. Shied further testified he believed the three garagemen who issued the estimates for Sweet were reputable and not trying to defraud anyone. He also testified that McClellan, his adjustor, "may or may not have" told him that the automobile was a total loss. Shied further testi-

fied that he and counsel for Sweet had discussions about settling this matter by either replacing the automobile and Grange taking the wrecked car, clipping it if it so desired, and selling it themselves.

Shied also admitted that Tucker, the Ashland agent, had informed him that the Sweet family had been customers of Grange for a long period of time and that he wished Shied would be reasonable. Shied admitted that he never checked with any dealers or salvage men as to whether a clipped car would have the same value as a similar car in its original body. He admitted he made no offer to Sweet to make up the difference in devaluation for a clipped car. Shied admitted that he knew a disagreement existed among bodymen as to whether clipping was an acceptable procedure, and that some felt this depreciated the value of an automobile and that an error in clipping will cause the car to be out of alignment so that it "can't be brought back." He also admitted he offered Sweet $1,000 in cash, plus the salvage, although he knew that the total cost of repairing, even with a "clip," exceeded $1,000.

The record contains testimony to the effect that an automobile consisting of two halves of different automobiles has substantially less value on the market by reason thereof.[2]

[2]Ben Camp, an automobile salesman and former garage service manager testified: "I would not give near as much for a clipped car as I would a good one."

Willis Dudley, a garage owner and salvage operator who testified he had clipped many automobiles stated: "Maybe its not right for me to say it, but I do—I do it for a living and I wouldn't want one." (The people accepting such a car purchase them at discount prices.)

Mr. Dudley again stated: "On a '72 car—there again I would have no way of putting a percentage on it, but I would say at least $1,000.00 less in value."

Kenneth Nichols, parts manager of Ed Jackman Pontiac-Olds and one of those submitting a total loss estimate: "I have heard the term (clipping). On my own personal car I would not accept it."

Kenneth C. Clem, a body manager of Smith Road Auto Sales and a witness for defendant-appellee testified as follows:

"Q. It is true a clipped car has a lesser value than a car that is not clipped, on the market?

There was testimony as to the problems involved in the process of "clipping." Norman Pore testified:

"Q. What would be the difficulties if a rear body clip or assembly is not fastened to the front part properly?

"A. I imagine in a very extreme case it could come off."

Grange's knowledge of Sweet's physical condition is shown by Tucker's testimony and by Shied.

Sweet testified that he was 25 years old and was rated 100 per cent disability because of injuries suffered in Viet Nam. He testified he could not walk easily and needed a car for errands which other people could accomplish by walking and that he had to drive to the veterans hospital every two weeks for check-ups. He also testified that after the accident he had to borrow his mother-in-law's car because he didn't have enough money to buy another car, and later bought a car for $200, which didn't last, and later bought another car for $250.

The policy of insurance in this case provides, in pertinent part, as follows:

"The limit of the company's liability for loss shall not exceed the actual cash value of the property, or if the loss is a part thereof, the actual cash value of such part, at the

"A. That goes to workmanship. There would be cars that would be of less value because of the workmanship and there are cars you can't tell they have been clipped.

"Q. Assuming a customer couldn't tell if it had been clipped, he might get the same value?

"A. I think he might be very disturbed if he found it had been clipped and he wasn't told this.

"Q. Well, if a customer was told if a car was clipped, doesn't that in itself cause the value of the vehicle to go down?

"A. In many people I think it would."

Terry Nelson, a bodyman and witness for defendant-appellee testified to the effect that some people don't want their cars clipped and that some garages "don't think it is a good idea to do them."

Norman Pore, an adjuster for defendant-appellee testified that some body repairmen "probably" don't approve of clipping.

Gerald Tucker, the local agent for defendant-appellee testified that he could have stated he wouldn't want his car clipped and that in 25 years as an agent, he had not been aware of the practice of clipping.

time of loss, nor what it would then cost to repair or replace the property or such part thereof with other of like kind and quality * * *."

Sweet's evidence entitled the jury to find that Grange proposed not to repair the automobile and not to replace it, nor to pay for either, but rather to rebuild it by cutting the car in two, discarding the rear half and welding the rear half of another automobile to the front half of Sweet's automobile. We find that such an offer or proposal was unreasonable as a matter of law based on the language of the policy and was so unreasonable as a matter of fact based on the evidence, as to be consistent only with a wilful intent to breach the contract. This conduct, coupled with Grange's knowledge of Sweet's physical and financial condition and its threat to refuse to pay for further storage unless the offer was accepted, could be found by the jury to be malicious or wanton or oppressive so as to entitle Sweet to punitive damages.

We hold that the case at bar is governed by the rule of *Kirk* v. *Safeco Ins. Co.* (1970), 28 Ohio Misc. 44, where paragraph two of the syllabus states:

"Where the actions of an insurer under a 'homeowner's policy' are such as to be a breach of contract amounting to a wilful, wanton, and malicious tort, such insurer may be assessed punitive damages."

The above rule is recognized as a general proposition of law in 16 Ohio Jurisprudence 2d 181, Damages, Section 157, as follows:

"This rule does not obtain, however, in those exceptional cases where the breach amounts to an independent, willful tort, in which event exemplary damages may be recovered under proper allegations of malice, wantonness, or oppression * * *."

Also, see *Brown* v. *Coates* (D. C. Cir. 1958), 253 F. 2d 36, where the court stated, at 39:

"[W]here a breach of contract merges with and assumes the character of a wilful tort, calculated rather than inadvertant, flagrant and in disregard of obligations of trust, punitive damages may be assessed."

25 Corpus Juris Secundum 1128, Damages, Section 120, states as follows:

"Where the requisite aggravating circumstances are present, exemplary damages may be allowed in tort cases even though the tort incidentally involves a contract. Thus, where the acts constituting a breach of contract also amount to a cause of action in tort, there may be a recovery of exemplary damages on proper allegations and proof. As sometimes stated, exemplary damages are recoverable for a tort committed in connection with, but independently of, the breach of contract, where the essentials of an award of such damages are otherwise present, the allowance of such damages being for the tort and not for the breach of contract. In order to permit a recovery, however, the breach must be attended by some intentional wrong, insult, abuse, or gross negligence which amounts to an independent tort."

In summary, the jury could have found that Grange knew the automobile was in storage, knew Sweet was totally disabled and had a special need for an automobile and knew he would be severely distressed if he did not accept their offer of settlement. The offer to pay $1,000 as the only alternative to "clipping" the car shows bad faith per se, as Mr. Shied admitted the total damage was over $1,000.

For the foregoing reasons, the assigned error that the judgment is contrary to law is sustained. The judgment of the Court of Common Pleas in favor of the Grange Mutual Casualty Company on the second count of the complaint is reversed and this cause is remanded to that court for further proceedings.

We now consider seriatim the nine assigned errors in Grange's cross appeal. Each is overruled. They read as follows:

"1. The court erred in directing a verdict for the plaintiff as to count number one of the plaintiff's complaint.

"2. The court erred in charging the jury on circumstanial evidence.

"3. The court erred in its charge on the law of damages.

"4. The court erred in charging the jury as to the method of determining the reasonable cost of storage as a part of the damages.

"5. The court erred in instructing the jury that they would have the complaint with them in the jury room.

"6. The court erred in its comments to the jury panel prior to the voir dire examination.

"7. The court erred in allowing plaintiff's witness to testify as to the value of the salvage as of the time of trial.

"8. The court erred in allowing the plaintiff to testify over objection as to the details of his injuries from Army Service, same having been brought into the testimony for the purpose of inflaming the passions of the jury.

"9. The court erred in allowing improper redirect testimony over the objection of the defendant."

The first assigned error complains of the fact that the trial court limited the evidence submitted to the jury on damages so as not to permit them to consider the policy provision on liability which limits the "cost to repair or replace the property or such part thereof with other of like kind and quality * * *." Grange's position is that under the policy it was not conclusively required to pay the difference between "value before collision" and "value after" if it would cost them less to "repair or replace the property or such part thereof with other of a like kind and quality * * *." Specifically, it is argued that a "clip" is a "repair" within the meaning of that policy. Grange does not claim that a "clip" constitutes a "replacement with property of like kind and quality."

We hold that within the meaning of insurance policy provisions of the type at bar, allowing the company the choice of the lesser of three alternatives—replace, repair or pay for—the "clip" operation described is, as a matter of law, not a compliance with any one of the three alternatives.

As a matter of law it does not constitute a repair. As a matter of law it does not constitute a replacement with property of like kind and quality. It is not claimed that it is an offer to "pay for." In point of everyday fact,

a "clip" might be considered a kind of replacement, but it is not one with property of like kind and quality. Under the language of this contract, "repair" cannot embrace "replacement" because replacements are expressly provided for in the contract and limited to those replacements which are of like kind and quality.

The witness for Grange gingerly avoided using the phrase "market value" in opining that a "clip" would not reduce the "value" of such a car.

Grange makes no claim and offers no evidence that the "clipped" car had the same "market value" it had prior to the collision. The concept of "market" includes buyers fully informed and it is understandable that no witness stated that a fully informed buyer would consider a "clipped" car in the same price range as one never wrecked, all else equal.

We find the following in Black's Law Dictionary (3rd ed. 1933), under the definition of repair:

"The word 'repair' contemplates an existing structure or thing which has become imperfect, and means to supply in the original existing structure that which is lost or destroyed, and thereby restore it to the condition in which it originally existed, as near as may be. *Fuche* v. *City of Cedar Rapids*, 158 Iowa, 392, 139 N. W. 903, 904, 44 L. R. A. (N. S.) 590.

" 'Repair' means to restore to former condition; not to change either the form or material of a building. *Ardesco Oil Co.* v. *Richardson,* 63 Pa. 162."

We find the nature of the "clipping" operation to be so inconsonant with the plain meaning of the word repair as to compel the conclusion that the offer to "comply" with the contract by the offer to "clip" was made in bad faith.

Secondly and separately, we find no compliance in this record with Civil Rule 51 sufficient to preserve the claim of "contract compliance by offer to clip."

Civil Rule 51(A) reads, in the second paragraph, as follows:

"No party may assign as error the giving or the failure to give any instruction unless he objects thereto before

the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

The objections by counsel for Grange go to the subject of "circumstantial evidence," because "there is nothing in this case involving circumstantial evidence and it has been charged," and to the separate subject of "mitigation of damages." This assignment of error is frivolous and is overruled.

Appellate Rule 12(A) reads in pertinent part as follows:

"Errors not specifically pointed out in the record and argued by brief may be disregarded."

For the foregoing reasons, all nine errors assigned by Grange are overruled, the judgment of the Court of Common Pleas of Ashland County in favor of Jerry L. Sweet and against Grange Mutual Casualty Company, in the amount of $3,500, plus costs, is affirmed, and this cause is remanded to that court for execution of that judgment.

*Judgment affirmed.*

RUTHERFORD, P. J., and DOWD, J., concur.