**BURNS et al., Appellees,**

v.

**PRUDENTIAL SECURITIES, INC. et al., Appellants.**

[Cite as *Burns v. Prudential Securities, Inc.,* 167 Ohio App.3d 809, 2006-Ohio-3550.]

Court of Appeals of Ohio,
Third District, Marion County.

No. 9–03–49.

Decided July 11, 2006.

---

810

812

817

Michael N. Ungar, David D. Geagley, and Suzanne E. Duddy, for appellant Jeff Pickett.

Patrick F. McCartan, Todd S. Swatsler, and Chad A. Readler, for appellant Prudential Securities, Inc.

David P. Meyer;  Scott L. Starr;  Thomas A. Hargett;  David J. Young;  and Michael A. Rumer, for appellees.

CUPP, Judge.

{¶ 1} Defendants-appellants, Prudential Securities, Inc. ("PSI") and Jeffrey Pickett, appeal the judgment of the Marion County Court of Common Pleas finding appellants liable for breach of contract, breach of fiduciary duty, and negligent supervision and awarding compensatory damages of approximately $16 million and punitive damages of $250 million to the class of plaintiffs-appellees.

{¶ 2} This appeal arises from a class action brought by approximately 300 retirees from Marion County, Ohio who maintained nondiscretionary securities accounts or annuities with PSI. Pickett, who worked as a "Senior Vice President Retirement Planning Consultant" in PSI's Marion, Ohio office, serviced these accounts. The written account and program agreements entered into by each of the class members stated that the plaintiffs would make investment decisions with regard to their accounts and that PSI could not sell, purchase, or otherwise trade account assets without the plaintiffs' consent.

{¶ 3} On or about October 7 or 8, 1998, Pickett believed that the stock market was going to suffer a severe and prolonged downturn and was fearful that the plaintiffs would lose their retirement assets in the event that downturn occurred. Therefore, Pickett, with the help of other PSI employees, reallocated the plaintiffs' investments in the Prudential ProChoice and Target programs [1] by selling

1. The ProChoice and Target programs were designed for growth and income. Clients enrolled in these programs owned no individual stocks, but maintained a diversified portfolio

all of the investments in their existing accounts and purchasing investments for them in the Invesco Total Return Fund and a United States Treasury money market fund.[2] Pickett's actions resulted in approximately 2,600 trades and the sale of over $40 million in investments over a two-day period. Neither PSI nor Pickett charged a commission on the reallocations, nor did PSI or Pickett earn any compensation based on the reallocations. It is undisputed, however, that the plaintiffs did not authorize the reallocations in advance.

{¶ 4} Within three days of the reallocations, PSI sent each plaintiff a standard confirmation slip, which informed them of the purchases and sales that had occurred in their accounts. Additionally, Pickett and his staff spoke with a number of the plaintiffs on the telephone, advising them of the reallocations and explaining that the reallocations were based on Pickett's prediction of an impending stock market crash.

{¶ 5} In the first week of November 1998, PSI sent each plaintiff a regular monthly statement that contained information about all of the activity in his or her accounts for that month, including the reallocations made on October 7 and 8. On November 12, 1998, Pickett held a seminar at the Marion Country Club, which many of the plaintiffs attended. At the seminar, Pickett explained his views of the stock market and why he felt it was too risky to be invested in the market at that time. Following Pickett's presentation, the attendees were given an opportunity to ask questions regarding the reallocations and the reasons for them.

{¶ 6} In February 1999, on the basis of an investigation that had commenced in October 1998, shortly after the reallocations were made without authorization, PSI terminated Pickett's employment. In March 1999, the PSI agents who assumed service of the accounts that had been assigned to Pickett began to contact the plaintiffs to explain the unauthorized trades and to advise the plaintiffs to reinvest in the stock market.

{¶ 7} On September 10, 1999, the plaintiffs filed a putative class action against PSI and Pickett in the Marion County Court of Common Pleas, alleging breach of contract, conversion, breach of fiduciary duty, and negligent supervision. The plaintiffs asserted that Pickett's reallocations to "safe" investments had caused them to miss out on a dramatic rise in the stock market that occurred after October 1998.

---

among a variety of asset classes. In general, client funds were invested in 60 percent stocks and 40 percent bonds.

2. After the reallocation, on average, the plaintiffs were invested in approximately 15 percent stocks, ten percent bonds, and the remaining 75 percent in a money market fund.

{¶ 8} On October 12, 1999, Pickett and PSI removed the case to federal court, claiming that the plaintiffs' claims were preempted by federal law regarding securities fraud and, thus, the state court lacked jurisdiction to hear the case. On May 8, 2000, the United States District Court for the Northern District of Ohio dismissed the case and remanded it to the trial court.

{¶ 9} In the two years following remand, the case proceeded unremarkably and with significant motion practice and discovery by each party. During this time, the class of plaintiffs was certified pursuant to Civ.R. 23. An appeal of that certification was taken to this court, wherein we affirmed. *Burns v. Prudential Securities, Inc.* (2001), 145 Ohio App.3d 424, 763 N.E.2d 234.

{¶ 10} On July 8, 2002, the trial court granted a motion for partial summary judgment previously filed by the plaintiffs. The trial court found that both Pickett and PSI were liable for breach of contract, conversion, and breach of fiduciary duty and that PSI was vicariously liable for the tortious actions of Pickett committed within the scope of his employment by virtue of respondeat superior. Trial on the remaining issues, negligent supervision and the calculation of damages, was scheduled to begin September 9, 2002.

{¶ 11} On September 6, 2002, the parties were once again before the trial court. The trial court ruled that the plaintiffs could present an extension of their claim of breach of fiduciary duty at trial by offering evidence that PSI "had and breached a continuing fiduciary duty during a period of months after the unauthorized sales at issue by, among other things, omitting to state material facts or concealing material information relevant to plaintiffs' determinations or choices of action in response to the subject transactions." The trial court allowed the claim over the appellants' objections on the basis that discovery, pretrial motions, negotiations, and even mediation had included assertions of the continuing nature of the duty, sufficient to deem it part of the complaint. The trial court also allowed the plaintiffs to present evidence to substantiate an award of punitive damages from PSI as a result of the alleged breach.

{¶ 12} On September 9, 2002, the morning that trial was set to begin, the appellants once again removed the case to federal court, alleging that the remaining claims were governed by federal securities fraud law. The following day, the federal district court concluded, for the second time, that there was no federal court jurisdiction for the claims and remanded the matter to state court.

{¶ 13} Trial commenced on September 11, 2002. On October 11, 2002, the jury returned verdicts against Pickett and PSI, finding the appellants liable for breach of fiduciary duty and negligent supervision, and apportioned compensatory damages in the sum of $5,905,598 as a proximate result of these torts. The jury also awarded the class $11,740,994 in compensatory damages with respect to the breach-of-contract claim that had been previously decided by summary judg-

ment.[3] In addition, the jury awarded punitive damages against PSI in the amount of $250,000,000. The trial court entered final judgment on the verdicts on April 21, 2003. In total, the plaintiffs were awarded $12.3 million in compensatory damages,[4] approximately $4 million in prejudgment interest, $2.8 million in attorney fees and expenses, and $250 million in punitive damages.

{¶ 14} Pickett and PSI filed motions for judgment notwithstanding the verdict and for a new trial. The trial court denied these motions in their entirety on July 24, 2003.

{¶ 15} Pickett and PSI subsequently appealed to this court. Pickett set forth six assignments of error, and PSI set forth 12 assignments of error for our review. While this appeal was pending, on March 31, 2006, Picket and PSI removed this action to federal court for a third time. Picket and PSI relied on the United States Supreme Court's recent pronouncement in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit* (2006), —— U.S. ——, 126 S.Ct. 1503, 164 L.Ed.2d 179, to argue, again, that federal securities fraud law barred the plaintiffs' action. But, on July 10, 2006, the federal district court determined that federal law did not bar the plaintiffs' action and remanded the matter to this court.

{¶ 16} On remand, we now consider Pickett's six assignments of error and PSI's 12 assignments of error. For clarity of analysis, we have addressed the assignments of error in a different order than they were presented to us. In addition, assignments of error that involve similar issues have been combined for determination.[5]

## PICKETT ASSIGNMENT OF ERROR NO. I

The Court of Common Pleas committed prejudicial error in refusing to grant a directed verdict or a judgment notwithstanding the verdict to defendants based on their ratification defense.

---

3. In addition to these breach-of-contract damages, the parties had stipulated to annuity damages in the amount of $539,483 prior to trial.

4. Per the jury instructions, the plaintiffs were entitled only to the greater amount of compensatory damages between the tort and contract actions. The $12.3 million in compensatory damages represents the $11.7 million awarded for the breach of contract plus the approximate $500,000 awarded in annuity damages.

5. Pursuant to the account agreements with PSI entered into by the plaintiffs, New York law governs the plaintiffs' claims as they arose from, and in connection with, the accounts. Therefore, our determination will be made on the basis of the law of that jurisdiction. All procedural matters, however, are subject to the law of Ohio. See *Howard v. Allen* (1972), 30 Ohio St.2d 130, 134, 59 O.O.2d 148, 283 N.E.2d 167 (Choice-of-law provisions apply to determine the application of state substantive law. While a forum may apply the substantive law of another state, the forum's own procedural law will govern the case).

## PRUDENTIAL ASSIGNMENT OF ERROR NO. I

The trial court erred by failing to hold that as a matter of law plaintiffs ratified the unauthorized trades.

{¶ 17} In their first assignments of error, Pickett and PSI contend that the trial court erred by failing to conclude, as a matter of law, that the plaintiffs had ratified Pickett's action of reallocating their investments following the unauthorized trades. All parties agree that Pickett's conduct breached his clients' written account agreements. Pickett himself admitted at trial that he should have gotten permission from his clients to reallocate their accounts. However, Pickett and PSI argue that the plaintiffs failed to object within a reasonable time after they were notified of the unauthorized trades and their failure to object constituted ratification. Accordingly, Pickett and PSI assert that the plaintiffs' claims for breach of contract and breach of fiduciary duty are barred and that the trial court erred in concluding otherwise.

{¶ 18} The standard of review for a ruling on a motion for judgment notwithstanding the verdict is the same one applicable to a motion for directed verdict. *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 344 N.E.2d 334. A motion for directed verdict or judgment notwithstanding the verdict is to be granted when, construing the evidence most strongly in favor of the party opposing the motion, the trial court finds that reasonable minds could come to only one conclusion and that conclusion is adverse to the party opposing the motion. Civ.R. 50(A)(4); *Crawford v. Halkovics* (1982), 1 Ohio St.3d 184, 185–186, 1 OBR 213, 438 N.E.2d 890. A directed verdict is appropriate when the opposing party has failed to adduce any evidence on the essential elements of the claim. *Cooper v. Grace Baptist Church* (1992), 81 Ohio App.3d 728, 734, 612 N.E.2d 357. The issue to be determined involves a test of the legal sufficiency of the evidence to allow the case to proceed to the jury, and it constitutes a question of law, not one of fact. *Hargrove v. Tanner* (1990), 66 Ohio App.3d 693, 695, 586 N.E.2d 141. A court of appeals reviews the trial court's ruling on a motion for directed verdict de novo. *McConnell v. Hunt Sports Ents.* (1999), 132 Ohio App.3d 657, 686–687, 725 N.E.2d 1193.

{¶ 19} There are stringent criteria that must be met for the application of an affirmative defense such as ratification. *LNC Investments, Inc. v. First Fid. Bank, N.A. New Jersey* (C.A.2, 1999), 173 F.3d 454, 463. In this case, in order to establish that the plaintiffs acquiesced to Pickett's reallocation of their investments, Pickett would have to demonstrate, among other things, that the plaintiffs acted "with full knowledge of all material facts relating to the transaction." Id., citing 57 N.Y.Jur.2d (1986) 108, Estoppel, Ratification and Waiver, Section 76.

{¶ 20} At trial, the plaintiffs introduced the expert testimony of James Francis, a former staff attorney for the Securities and Exchange Commission who had also been previously employed as the compliance director for The Ohio Company, a Columbus, Ohio-based brokerage firm with approximately 50 branch offices, for 16 years. In his testimony, Francis opined that the proper compliance procedure following the unauthorized trades by Pickett would have been to investigate the circumstances of the trades as soon as they were discovered, to reverse the transactions at no cost to the clients, and to send the clients an explanation letter of what had transpired. Francis stated that the letter should have contained the information that the trades were unauthorized, that PSI was not in agreement with the trades made by Pickett, and that the trades had been reversed at no cost. Additionally, he said that the letter should have contained the contact information of the compliance department at PSI so that clients could talk to someone if they had further questions. John Gordon, who, in 1998, was the divisional administrative officer for the Northern division at PSI, also testified on this subject, stating that PSI typically did reverse transactions that were subsequently determined to be unauthorized.

{¶ 21} Following the unauthorized trades of the plaintiffs' accounts, the record reflects that the following action was taken by Pickett and PSI: within three days of the reallocations made by Pickett, PSI sent all of the plaintiffs "confirmation slips" which informed them of the transactions that had occurred. Each of the confirmation slips stated, "[E]xecution or orders shall be conclusive if not objected to in writing, addressed to the branch manager of the office serving this account within five days after transmittal to you by mail or otherwise."

{¶ 22} Within the first week of November 1998, approximately three weeks after the unauthorized trades were effected, the plaintiffs received monthly statements for October, which also informed them of the reallocations. The statements provided, "All account statements sent to you shall be considered binding upon you if not objected to within ten days." This language corresponded to a provision in the original account agreements that the plaintiffs entered into when they opened their accounts with PSI, which stated:

Confirmation of transactions and statements for my accounts shall be binding upon me if I do not object in writing within ten days after mailing to me. I agree to promptly notify you by a writing addressed to the Branch Manager of the branch in which my account is maintained of any item I believe to be an error or omission in any confirmation or statement.

{¶ 23} Although there is no evidence that any of the plaintiffs objected in writing to the branch manager, as directed by the confirmation slips, monthly statements, and account agreements, Pickett testified that between October 19, 1998 and November 12, 1998, following the trades, he received phone calls from

approximately 50 of his clients about the transactions. He testified that during these phone calls, he explained to the clients that he felt there was a tremendous amount of risk in the stock market and that the clients' investments would be safer out of the market. Pickett also testified that in addition to the 50 clients he spoke to, one of his assistants spoke to approximately 80 people.

{¶ 24} The record further indicates that on November 12, 1998, Pickett invited clients whose accounts had been reallocated to a seminar. The invitation did not mention the reallocation, but Picket testified that because "we all knew their investments were sold out," he guessed that "every single person who came to the seminar knew what the topic of the seminar was going to be."

{¶ 25} The seminar was entitled "Market Volatility: The Risk Ahead." The materials, which were submitted and approved by PSI, included an assessment of the current stock market risks that were classified as (1) high market valuations, (2) world financial crisis, (3) political risk, and (4) hedge funds risk. The seminar also included a chart entitled "Birth of a Bull," which compared valuations between October 21, 1998 and other "market bottoms" over the past 65 years. Pickett explained to the clients that at that time the market was extremely low and that he would let them know when the time was right to get back into the market. The evidence indicates that from the time of the seminar to the time Pickett was terminated from PSI, on February 22, 1999, Pickett never contacted his clients to advise them to reenter the stock market.

{¶ 26} Despite the confirmation slips, monthly statements, and seminars, the evidence establishes that it was never explained to Pickett's clients that what Pickett had done was unauthorized or was a breach of the account agreement. At trial, Pickett testified as follows:

Q: When you spoke with your clients after October 8th, isn't it true that you never used the words "unauthorized transaction," but you always used the word "reallocation"?

A: Yes.

* * *

Q: Did Prudential ever tell you that you should say to those clients that what you did was an unauthorized act or was in breach of the law or was in breach of the contracts?

A: No.

{¶ 27} The plaintiffs introduced an email at trial, sent from one of Pickett's clients to him on December 3, 1998, inquiring about a letter dated October 8, 1998 regarding the reallocation of his Target portfolio. The client wrote:

I really have a problem with this since I did not give anyone instructions to do this reallocation and I definitely would not have waited until this date when the

stocks that were sold were almost at their low. I do not understand why this was done especially when they were sold to take that money over to government money market [sic] which in no way would regain any money. I thought we were in this for the long term and I realize stock prices go up and down but I see no reason for what was done and in such a large amount of reallocation done at that time.

I would appreciate seeing where I gave the authorization to make this reallocation and their reasoning behind it. I feel it was an undue loss of money out of my account.

{¶ 28} Approximately one month later, on January 5, 1999, the client sent Pickett another email, stating:

I received a call from a Prudential lawyer from New York, which was concerned about the original email that I sent to you requesting some information on my investment. After I talked to him, we agreed that I was not out of line asking these questions and expecting answers to my questions. I did receive you [sic] email saying that you were shipping me a package and I did receive the package. I thought that the package would contain the answers to my questions but it only contained articles giving many analysis [sic] views of the stock market and the trends. The articles did not answer my questions and I am still waiting on the answers to my questions.

{¶ 29} In addition to the lack of a full explanation of the nature of the trades, the evidence indicates that Pickett's clients were never informed that PSI would reverse the trades at their own expense if the client so desired. In fact, the record does not reveal that Pickett's clients were even told that they had the *option* of reversing the trades. According to the record, on October 29, 1998, one of Pickett's clients came to him and inquired about the reallocations. Pickett testified that he explained the volatility of the stock market to the client but did not suggest reversal of the trades. The evidence indicates that the client, on his own accord, inquired about reversal and asked to be back in the market. Pickett subsequently effected the reversal but because of a rise in the market since the time of the trades, the reversal required an extra investment by the client. The record demonstrates that the reversal was done at the client's expense. In explaining why PSI did not pay for the reversal, Pickett testified as follows:

Q: Did you know that the clients had the legal right to demand that Prudential reverse these trades, not at the client's expense, but at Prudential's expense, did you, as the broker working for my [sic] clients, know that?

A: I'm sure I did know that.

Q: Okay. But you never told them, did you, because you simply weren't thinking about it, is that true?

A: And that's the truth, yes.

{¶ 30} In addition to this lack of information, the record indicates that PSI was presenting to other clients a different financial outlook than the one that was approved for Pickett's November 12, 1998 seminar for the members of the plaintiff class. In October 1998, the Investment Management Services department at PSI, responsible for operating the ProChoice and Target accounts in which the plaintiff class was invested, produced a brochure for those clients entitled "Putting the Investment Environment Into Perspective." The brochure stated that the Dow Jones had declined by approximately 20 percent from July 1998 to October 1998, smaller companies had declined by substantially more, and stock markets throughout the world were "beginning to reflect fears of a potential global recession," resembling the concerns that Pickett testified he had had. However, the brochure advised its brokers and clients that "[w]e shouldn't be spending our time trying to predict what will happen in the stock market. Staying invested and having a long-term plan in place is what is important."

{¶ 31} Further evidence adduced at trial demonstrated that the stock market reported a marked rise between October 9, 1998 and November 12, 1998. This trend led Ralph Acampora, a renowned market researcher for PSI, to conclude, on October 21, 1998, that "the bear market in U.S. stocks is over" and to predict that the Dow Jones Industrial Average, which on October 7 and 8, 1998 was at approximately 7,700, could reach 9,300 by the end of the year. In an interoffice weekly review memorandum issued on November 6, 1998, another PSI market analyst, Hildegard Zagorski, stated that "[i]t was another great week for the bulls as stocks continued their upward trek. Since the lows reached in early October, the Dow Jones Industrial Average has risen about 1400 points, as of [November 5]'s close, as investors become more optimistic about the outlooks for the U.S. economy and global markets."

{¶ 32} In support of the argument that the plaintiffs ratified the unauthorized trades by failing to file a written objection, Pickett and PSI cite several cases in which courts have found ratification applicable for an investor's failure to comply with the written objection language in the confirmation or account statements.[6] However, we find that these cases are distinguishable from the facts in the present case because those cases do not involve the broker failing to fully inform the client about his or her options.

{¶ 33} PSI advances the argument that the plaintiffs had been informed of all the information to which they were entitled as a result of their nondiscretionary accounts. PSI asserts that because its brokers were servicing the plaintiffs' nondiscretionary accounts, they had limited duties to the plaintiffs. Specifically,

---

6. See, e.g., *Modern Settings, Inc. v. Prudential–Bache Sec.* (C.A.2, 1991), 936 F.2d 640; *First City Sec. v. Shaltiel* (C.A.7, 1995), 44 F.3d 529.

PSI contends that its brokers did not have a duty to follow up with the clients after the unauthorized trades and inform them of all of their options. Thus, the clients' failure to object in light of the information given to them, PSI asserts, constitutes ratification. We cannot agree.

{¶ 34} In general, the duties of a broker associated with a nondiscretionary account, such as these, include the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price, and financial prognosis; the duty to inform the customer of the risks involved in purchasing or selling a particular security; the duty not to misrepresent any fact material to the transaction; and the duty to transact business only after receiving prior authorization from the customer. *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (E.D.Mich.1978), 461 F.Supp. 951, 953, affirmed (C.A.6, 1981), 647 F.2d 165. On the other hand, brokers who handle discretionary accounts become fiduciaries in the broad sense and have increased duties to keep customers informed regarding the changes in the market that affect the customer's interest and to explain the practical impact and potential risks of the course of dealing in which the broker is engaged. Id.

{¶ 35} There exist, however, circumstances when an account is neither purely nondiscretionary nor purely discretionary. Some courts have held that if a broker assumes control over an account by acting without the customer's prior authorization, he owes his customer the same fiduciary duties he would have had if the account had been discretionary from the moment of its creation. Id.; *De Kwiatkowski v. Bear, Stearns & Co., Inc.* (C.A.2, 2002), 306 F.3d 1293; *J.C. Bradford Futures, Inc. v. Dahlonega Mint, Inc.* (C.A.6, 1990), 907 F.2d 150.

{¶ 36} Although Ohio courts have not addressed the instant factual scenario, Ohio, in general, has an expansive view of the relationship between a broker and client. "The liabilities of a broker to his [principal] are those of an agent. The relation of principal and agent is always regarded by the court as a fiduciary one, implying trust and confidence." 10 Ohio Jurisprudence 3d (1995) 96, Brokers, Section 116.

{¶ 37} After review, we find it contradictory for PSI to assert that its broker was servicing nondiscretionary accounts and, thus, the broker's duties were merely transactional in nature, while at the same time acknowledging that the broker acted in contravention of the nondiscretionary agreement by taking it upon himself to liquidate his clients' investments that he deemed too risky. Rather, we hold that if a nondiscretionary broker assumes control of his clients' accounts and performs transactions *at his own discretion* without the clients' approval, the broker must take on the duties of a discretionary broker, including the continuing duty to keep the clients informed of financial information that may

affect their investments and the duty to disclose all material information to the clients. See *Leib,* 461 F.Supp. at 953; *Silverberg v. Thomson, McKinnon Securities, Inc.* (Feb. 14, 1985), 8th Dist No. 48545, at *4.

{¶ 38} From our review of the record, we find that the plaintiffs presented substantial evidence that the information provided to them concerning the reallocations did not include all the material facts and that they were not made aware of all of the circumstances of the trades. In addition, we hold that Pickett's unauthorized trading of his clients' accounts elevated his duties as a fiduciary to the extent that he was required to disclose all material facts of his unauthorized trades, even after the trades had been completed, including his clients' right to reversal of the trades at PSI's expense. In the absence of the disclosure of all material facts, we cannot conclude that the plaintiffs ratified the unauthorized trades made by Pickett by failing to object in writing. Ratification occurs only when the customer, with full knowledge of the facts, manifests his intention to adopt the unauthorized transaction. See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng* (C.A.D.C.1990), 901 F.2d 1124, 1129. Without full knowledge, there can be no ratification. Accordingly, we hold that the trial court did not err in denying the appellants' motion for a directed verdict or judgment notwithstanding the verdict.

{¶ 39} Pickett's first assignment of error and PSI's first assignment of error are, therefore, overruled.

## PICKETT ASSIGNMENT OF ERROR NO. II

The Court of Common Pleas committed prejudicial error in failing to properly instruct the jury on the ratification defense.

## PRUDENTIAL ASSIGNMENT OF ERROR NO. II

The trial court erred in its jury instructions on ratification and fiduciary duty.

{¶ 40} In their second assignments of error, Pickett and PSI allege error in the trial court's instructions to the jury. Specifically, the appellants object to the instructions given on ratification and the fiduciary duties of brokers of nondiscretionary accounts. On this basis, Pickett and PSI contend that a new trial is warranted.

{¶ 41} A strong presumption exists in favor of the propriety of jury instructions. *Ohio Plaza Assoc., Inc. v. Hillsboro Assoc.* (June 29, 1998), 4th Dist. No. 96CA898, at *10. In general, the trial court should give requested jury instructions "if they are correct statements of the law applicable to the facts in the case." *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575

N.E.2d 828. However, jury instructions must be viewed in their totality. *Margroff v. Cornwell Quality Tools, Inc.* (1991), 81 Ohio App.3d 174, 177, 610 N.E.2d 1006. Instructions that, in their totality, are sufficiently clear to permit the jury to understand the relevant law will not be the cause of a reversal upon appeal. *Burwell v. Am. Edwards Labs.* (1989), 62 Ohio App.3d 73, 79, 574 N.E.2d 1094. Whether the jury instructions correctly state the law is a question of law, which we review de novo. *Murphy*, 61 Ohio St.3d at 591, 575 N.E.2d 828.

{¶ 42} The jury instructions stated:

The status as a fiduciary imposes upon a stock broker and a broker firm an affirmative duty to inform his investor of all of the relevant facts relating to the subject matter of the managed investments that affect the investor's interest. Ratification of unauthorized reallocations by an investor cannot occur unless that investor has full knowledge and understanding.

{¶ 43} In addition, PSI alleges error in an instruction on the breach-of-fiduciary duty claim, which stated that it had been Pickett's and PSI's duty "to make full, fair, and prompt disclosure of all facts within a broker's or brokerage firm's knowledge which a reasonable client would likely consider important in making an investment decision or a decision related to an investment."

{¶ 44} Pickett and PSI contend, as they did in their first assignments of error, that the appellants' duties as brokers of nondiscretionary accounts were quite limited and that these jury instructions "vastly overstated" those duties. Pickett and PSI maintain that they had a duty only to inform the plaintiffs that the trades had taken place but the jury instructions misled the jury into believing that the appellants were required to meet the duties of a discretionary broker.

{¶ 45} Although Pickett and PSI correctly set forth the duties of a nondiscretionary broker *under ordinary circumstances,* those circumstances do not exist in the case before us. As we held in the determination of Pickett's and PSI's first assignments of error, in those cases in which a broker assumes unauthorized control over a nondiscretionary account, the fiduciary duties imposed upon the broker increase by virtue of the broker's unauthorized actions. See *Leib*, 461 F.Supp. at 953. Accordingly, we conclude that the jury instructions set forth a correct statement of the law regarding the appellants' fiduciary duties to the plaintiffs.

{¶ 46} Moreover, we can find no error in the jury instruction on ratification. It is settled law that full knowledge of the unauthorized act and of all material matters related to it is essential to a valid ratification. See *Master Commodities, Inc. v. Texas Cattle Mgt. Co.* (C.A.10, 1978), 586 F.2d 1352, 1359–1360.

{¶ 47} We note that the trial court held extensive conferences to determine what jury instructions it would give. We find that the instructions ultimately given reflected a correct statement of the law and were sufficiently clear to permit the jury to understand the relevant law. Therefore, we do not find that the trial court erred when it instructed the jury.

{¶ 48} Pickett's second assignment of error and PSI's second assignment of error are overruled.

## PICKETT ASSIGNMENT OF ERROR NO. III

The Court of Common Pleas committed prejudicial error in instructing the jury that the "New York Rule" was the proper measure of damages for breach of contract.

## PRUDENTIAL ASSIGNMENT OF ERROR NO. III

The trial court's and jury's erroneous application of the New York Rule of conversion damages to plaintiffs' contract claim requires a new trial or judgment in favor of defendants.

{¶ 49} In their third assignments of error, Pickett and PSI assert that the jury instruction regarding the measure of damages for the appellants' breach of contract was in error. Pickett and PSI contend that although the account agreements included a choice-of-law provision pursuant to which New York law would govern, the trial court erred in applying and subsequently instructing the jury on the calculation of damages relating to the breach of contract because the "New York rule" is only applicable to the measure of damages caused by conversion and not by breach of contract. The appellants assert that the application of this rule caused them prejudice because the jury was allowed to measure damages over an eight-month period, which, the appellants claim, led to an award of an additional $6 million in compensatory damages. If, in the alternative, the New York rule is applicable, then, Pickett and PSI argue, the rule does not allow the time when damages could be calculated to extend to a period of eight months.

{¶ 50} Jury Instructions

{¶ 51} At the outset, we note, once again, that whether the jury instructions correctly state the law is a question of law that we review de novo. *Murphy*, 61 Ohio St.3d at 591, 575 N.E.2d 828.

{¶ 52} The trial court instructed the jury on the measure of damages as follows:

The measure of damages for breach of contract is the difference between the value of the investments at the time of the unauthorized reallocations on or about October 7, 8, and/or 9, 1998, and the highest intermediate value those investments reached between October 7, 1998 and a reasonable period of time after the plaintiffs received notice of the unauthorized reallocations.

{¶ 53} This language follows the "conversion theory" measure of damages also known as the "New York rule." In general, New York courts have applied this theory in calculating damages when an item of fluctuating value is wrongfully sold, converted, or not purchased when it should have been. See *Schultz v. Commodity Futures Trading Comm.* (C.A.2, 1983), 716 F.2d 136, 139. Pursuant to this theory, a plaintiff can receive either the value of the stock at the time of the wrongful act or the highest intermediate stock price between the date of the act and a reasonable time thereafter during which the stock could have been replaced by the plaintiff, whichever is greater. *Agostinelli v. DeBartolo Realty Corp.* (Dec. 19, 2001), 7th Dist. Nos. 01 CA 9 and 01 CA 10, at *7, 2001 WL 1647218. However, contrary to Pickett's and PSI's assertions that the calculation is only for conversion, the New York rule can also be used to measure damages for a breach-of-contract action.

{¶ 54} In *In re Dickinson* (1916), 171 A.D. 486, 157 N.Y.S. 248, the New York Appellate Division explained that an unauthorized sale, not having been made pursuant to a client's instructions, may give rise to several causes of action. The court held that whether a client proceeds against a broker for conversion or asserts a right to recover damages for a breach of contract for an unauthorized sale of stock, the measure of damages is the same. Id., 171 A.D. at 251–252. In an action, based on contract, for damages for a broker's unauthorized sale of stock, the damages would be determined by the highest market price of the stock within a reasonable time after the customer's discovery of the unauthorized sale. Id.[7] Although the New York rule is often cited in connection with conversion actions, it is not limited to conversion alone. See *Katara v. D.E. Jones Commodities, Inc.* (C.A.2, 1987), 835 F.2d 966 (Second Circuit Court of Appeals, applying New York law, did not find that the New York rule was inapplicable to the plaintiff's breach-of-contract claim). Rather, the rule is likewise applicable in cases where stock "was not delivered according to contractual or other legal obligation, or [was] *otherwise improperly manipulated.*" (Emphasis added.) *Schultz,* 716 F.2d at 141. Accordingly, we find that the trial court properly

---

7. See, also, *Herman v. T. & S. Commodities, Inc.* (S.D.N.Y.1984), 592 F.Supp. 1406, 1421; *Schultz v. Commodity Futures Trading Comm.* (C.A.2, 1983), 716 F.2d 136, 139; *Barber v. Ellingwood* (1910), 137 App.Div. 704, 704–713, 122 N.Y.S. 369; *Baker v. Drake* (1873), 53 N.Y. 211, 211–213.

instructed the jury on the applicability of the New York rule to the plaintiffs' breach-of-contract action.

{¶ 55} Jury's Application of Instructions

{¶ 56} Pickett and PSI maintain that even if the New York rule does apply to the plaintiffs' contract claim, the jury calculated the damages incorrectly. Pickett and PSI allege that the eight-month period used by the jury was unreasonable under the circumstances. Pickett and PSI assert that the plaintiffs' damages should have been calculated from the date of the unauthorized trades to the date when each plaintiff learned of them, allowing the plaintiffs an award of the increase in value of their shares in the days immediately after the reallocations were effected. Instead, Pickett and PSI contend that calculating the damages from the date of the unauthorized trades to a date eight months later allowed the plaintiffs to, in essence, "wait out a half-year bull market and then leverage Pickett's transgression into a massive return on an abandoned investment."

{¶ 57} On appellate review of contractual damages, the factual determinations of a trier of fact will not be overturned as being against the manifest weight of the evidence if there is some competent, credible evidence going to each element of the cause of action. *Hofner v. Davis* (1996), 111 Ohio App.3d 255, 259, 675 N.E.2d 1339, citing *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

{¶ 58} For the purpose of measuring damages, the question of what constitutes a reasonable time after knowledge or notice of the wrongful sale depends upon the circumstances of each particular case. *Phillips v. Bank of Athens Trust Co.* (1952), 202 Misc. 698, 119 N.Y.S.2d 47, 52. No fixed period is prescribed by law, nor is there any rule of thumb by which such period can be ascertained. Id. The time may be more substantially limited, however, if the client definitely takes the position that he will or will not repurchase the investments. Id. If he makes his decision at once or at a definite time, the period during which he may measure his damages will then terminate. Id. If a definite decision is not made, inferences may be drawn from surrounding circumstances as to the period of time that is reasonable for the ascertainment of damages. Id.

{¶ 59} A reasonable time has been interpreted by some New York courts to be: 15, 30, or 60 days;[8] 12 days;[9] nine days;[10] 24 days;[11] and seven days.[12] See,

---

8. *Mayer v. Monzo* (1917), 221 N.Y. 442, 117 N.E. 948.

9. *Hall v. Bache* (1932), 235 A.D. 256, 256 N.Y.S. 693.

10. *Keller v. Halsey* (1909), 130 A.D. 598, 115 N.Y.S. 564.

generally, *Bache & Co., Inc. v. Internatl. Controls Corp.* (S.D.N.Y.1972), 339 F.Supp. 341, 351. However, a "reasonable time" has not been limited to merely days. See, e.g., *Hayward v. Edwards* (1938), 167 Misc. 694, 4 N.Y.S.2d 699.

{¶ 60} In the case sub judice, the jury awarded the plaintiff class $11,740,994 in damages for the appellants' breach of contract. The jury determined that damages should be calculated from October 7, 8, and/or 9, 1998, when the unauthorized trades were effected, to June 4, 1999, the date determined by the jury, that would "have been reasonable for the plaintiff class to have re-entered the markets after receiving notice of the unauthorized reallocations."

{¶ 61} The purpose of the reasonable-time rule is to allow the plaintiff "reasonable opportunity to consult counsel, to employ other brokers and to watch the market for the purpose of determining whether it is advisable to purchase on a particular day or when the stock reaches a particular quotation, and to raise funds if he decides to repurchase." *Caballero v. Anselmo* (S.D.N.Y.1991), 759 F.Supp. 144, 149, citing *Gelb v. Zimet Bros., Inc.* (1962), 34 Misc.2d 401, 228 N.Y.S.2d 111, 113.

{¶ 62} When a case involves misrepresentations following the unauthorized transaction, such misrepresentations should also be considered in the totality of the circumstances in determining what is a reasonable time in order to effect the purpose of the rule. In the instant case, the evidence established that Pickett and PSI continually failed to inform the plaintiffs of their option to have the trades reversed at PSI's expense and failed to ever inform the plaintiffs that Pickett's actions had been unauthorized.

{¶ 63} The evidence adduced at trial further indicates that it was not until Pickett had been terminated and his former clients began meeting with their new brokers that they were fully informed of the circumstances of Pickett's actions. According to the testimony of Ken Vincent, one of the three brokers who took over the accounts, PSI did not give the new brokers any information regarding the client base except that Pickett had been terminated and that three brokers were taking over his accounts. Mr. Vincent stated that by the time the new brokers had fully identified the problem and had conducted meetings with the clients, a number of months had elapsed. Another broker who inherited Pickett's clients, Richard Dixon, stated that he began meeting with clients on March 1, 1999 and met with them into May. Sandy Vincent, the third broker, testified that she also began meeting with the plaintiffs in March 1999. Ms. Vincent testified that she and her staff worked 12–hour days, seven days a week for approximately

---

11. *Gelb v. Zimet Bros.* (1962), 34 Misc.2d 401, 228 N.Y.S.2d 111.

12. *Phillips v. Bank of Athens Trust Co.* (1952), 202 Misc. 698, 119 N.Y.S.2d 47.

ten weeks and they were still not able to contact everyone to explain the unauthorized trades.

{¶ 64} Accordingly, we find that this testimony is competent, credible evidence to support the jury's conclusion that it was not until June 4, 1999 that the plaintiffs had a reasonable opportunity to make an informed decision as to whether they wished to reenter the stock market. While we acknowledge that the majority of cases reviewed provide for a shorter "reasonable time" period than the jury calculated, we believe the longer time frame is justified here by the particular facts of this case. Therefore, we cannot find that the jury erroneously calculated the plaintiffs' compensatory damages.

{¶ 65} Pickett's third assignment of error and PSI's third assignment of error are overruled.

## PICKETT ASSIGNMENT OF ERROR NO. IV

The Court of Common Pleas committed prejudicial error in denying the motion to transfer venue.

## PRUDENTIAL ASSIGNMENT OF ERROR NO. IX

The trial court erred by denying defendants' Motion to Change Venue.

{¶ 66} In Pickett's fourth assignment of error and PSI's ninth assignment of error, the parties assert that the trial court erred in not granting appellant PSI's motion to change venue in which Pickett joined. Pickett and PSI claim that because of the pretrial publicity that portrayed Pickett and PSI negatively, including no fewer than seven articles in the local paper, and because of the "small town ties" between the jurors and the members of the plaintiff class, an impartial and unbiased jury could not have been assembled in Marion County, and the appellants were deprived of a fair trial.

{¶ 67} The decision whether to change venue is within the trial court's sound discretion and will not be overturned absent an abuse of that discretion. *State ex rel. Dunbar v. Ham* (1976), 45 Ohio St.2d 112, 114, 74 O.O.2d 213, 341 N.E.2d 594.

{¶ 68} Change of venue in a civil action is governed by Civ.R. 3(C). "Upon motion of any party or upon its own motion the court may transfer any action to an adjoining county within the state when it appears that a fair and impartial trial cannot be had in the county in which the suit is pending." Civ.R. 3(C)(4). On motion by a party, the moving party has the burden of showing that a change of venue is necessary and proper. *Hanning v. New England Mut. Life Ins. Co.* (S.D.Ohio 1989), 710 F.Supp. 213, 215.

{¶ 69} The Ohio Supreme Court has long held that the voir dire process provides the best evaluation as to whether such prejudice exists among community members that precludes the defendant from receiving a fair trial. *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus. Further, a defendant claiming that "pretrial publicity" has denied him a fair trial must show that one or more of the jurors were actually biased. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749.

{¶ 70} The record, in the case sub judice, reveals that there were several articles published in The Marion Star, the local newspaper, regarding the progress of the case. The record further indicates that five of the seven articles that Pickett and PSI specifically cite as being inflammatory were published in 2001, nearly nine months before a jury was convened and trial began. Of the other two articles, one appeared September 9, 2002, the day trial was scheduled to begin, and provided an overview of the facts in the case, the claims made by the plaintiffs, and an explanation of Pickett's actions by his defense counsel. The other article appeared September 10, 2002, and explained that the appellants had removed the case to federal court the day before and that the trial was on hold.

{¶ 71} During voir dire, there was extensive discussion among counsel and the prospective jurors about whether the prospective jurors had seen or read articles about the case in the newspaper. Several of the prospective jurors stated that they had read the articles. Many of them noted that they had read articles in the past and had just recently seen, in the two days before trial, additional articles. A few of the jurors stated that based on one of the articles, they believed that they would not be called to serve as a juror because the case was going to be heard in federal court. Many of the jurors also explained that they did not necessarily believe what appeared in the paper.

{¶ 72} After a survey of how many of the prospective jurors had read the newspaper articles, counsel for PSI requested to speak individually to those who responded affirmatively. Counsel's request was granted by the trial court. Each prospective juror who acknowledged seeing the articles was asked in detail about what articles he or she had read and what effect, if any, the articles had on his or her opinion of the case.

{¶ 73} Of the prospective jurors who had read the articles, all but one was dismissed for cause, either based on their preconceived notions from the articles or for another, separate reason. The one remaining juror who had read the articles was impaneled. The impaneled juror stated specifically during voir dire, however, that she did not form an opinion based on the articles. PSI did not elect to challenge this juror for cause.

{¶ 74} In addition to being questioned about any previous information that the prospective jurors may have had about the case, each venireperson was thoroughly questioned over a period of two days on his or her connections to PSI, Pickett, class members, general knowledge of the stock market and investing, opinions of large corporations, and notions of fairness and justice.

{¶ 75} We have reviewed the record of the voir dire and the trial court's rulings in regard to the motion for change of venue and can find no error in the trial court's rulings in these matters. The trial court allowed an extensive voir dire without imposing restrictions or time limits on the opportunity of any party's counsel to question the prospective jurors. This action underscores the trial court's efforts to empanel a fair and impartial jury. From the evidence of record, we do not find that the trial court's action in overruling the motion for change of venue was unreasonable, arbitrary, or capricious, and, thus, was not an abuse of discretion.

{¶ 76} Pickett's fourth assignment of error and PSI's ninth assignment of error are, therefore, overruled.

## PICKETT ASSIGNMENT OF ERROR NO. V

The Court of Common Pleas committed prejudicial error in failing to excuse jurors for cause.

{¶ 77} Under this assignment of error, Pickett specifically asserts error with respect to the trial court's refusal to excuse certain jurors for cause. Specifically, Pickett alleges that, during voir dire, one of the prospective jurors disclosed that she was a daughter-in-law of one of the class plaintiffs and, during trial, two other jurors disclosed that they had ties to the class plaintiffs. Pickett claims that the trial judge should have excused all of these jurors.

{¶ 78} The determination whether a prospective juror should be disqualified for cause is a discretionary function of the trial court. *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301, syllabus. Such a determination will not be reversed on appeal absent an abuse of discretion. Id. The erroneous denial of a challenge for cause may be prejudicial because it forces a party to use a peremptory challenge on a prospective juror who should have been excused for cause, giving that party fewer peremptories than the law provides. *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646.

{¶ 79} First, Pickett contends that juror Rebecca Worley should have been dismissed for cause because she was a daughter-in-law of one of the class plaintiffs. However, we can find no support for this contention in the record. The only connection that Worley revealed during voir dire was that her "separated husband's sister" might be one of the plaintiffs, but she was not certain

whether she was involved in the litigation. Worley also stated that it would "absolutely not" be hard to overlook that connection.

{¶ 80} The record indicates that counsel for the appellants then moved to challenge Worley for cause. The trial court determined that on the basis of the inquiry of Worley so far, she would not be excused, but the trial court gave leave to appellants' counsel to bring Worley back in to question her further. However, Pickett waived any further voir dire of Worley.

{¶ 81} Second, Pickett contends that it was error for the trial court to allow Ronee Berry and Judith Worcester to continue to serve as jurors once Berry and Worcester recognized some of the plaintiffs in the courtroom on the first day of trial. Berry indicated that she was a great-niece of one of the class plaintiffs, and Worcester stated that a class member was a former schoolmate. Upon receiving this information, counsel for both sides agreed to allow the trial court to question the two jurors individually in chambers. In so doing, counsel for both sides submitted questions for the trial court to use in questioning the jurors.

{¶ 82} Upon questioning, both Berry and Worcester stated that any acquaintance with a member of the plaintiff class would not affect their ability to be fair and impartial jurors. Berry stated that although one of the plaintiffs was her grandfather's sister, she saw her great-aunt only about once a year and did not know her very well. Worcester stated that she had not seen her classmate in a number of years and was only an acquaintance. The trial court was satisfied with this inquiry and allowed both jurors to continue with no objections from counsel.

{¶ 83} The trial court has discretion in determining a juror's ability to be impartial. *State v. Williams* (1983), 6 Ohio St.3d 281, 288, 6 OBR 345, 452 N.E.2d 1323. "[D]eference must be paid to the trial judge who sees and hears the juror." *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841. In the specific instances cited by Pickett, we cannot find that the trial court abused its discretion in failing to dismiss jurors Worley, Berry, and Worcester for cause. Each juror affirmed that they could be fair and impartial despite the circumstances. We are satisfied, as was the trial court, with their affirmations.

{¶ 84} Pickett's fifth assignment of error is overruled.

## PICKETT ASSIGNMENT OF ERROR NO. VI

The Court of Common Pleas lacked subject matter jurisdiction over this case.

## PRUDENTIAL ASSIGNMENT OF ERROR NO. XII

The trial court did not have jurisdiction over this class action, which is based upon alleged misrepresentations and omissions made in connection with the purchase or sale of a covered security.

{¶ 85} In Pickett's sixth assignment of error and PSI's 12th assignment of error, the appellants argue that the plaintiffs' lawsuit fell within the exclusive purview of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") and, accordingly, the state trial court had no jurisdiction over the case. Pickett and PSI contend that because the plaintiffs' claim of breach of an ongoing fiduciary duty was based on the allegations that Pickett and PSI omitted and concealed information, the plaintiffs' claim was preempted by SLUSA and should have been removed to federal district court.

{¶ 86} A state court civil action may be removed to federal court under Section 1441(b), Title 28, U.S.Code if the claim arises under federal law. *Beneficial Natl. Bank v. Anderson* (2003), 539 U.S. 1, 6, 123 S.Ct. 2058, 156 L.E.2d 1. However, under the "well-pleaded complaint rule," a plaintiff who has both state and federal claims may avoid federal court by limiting his or her complaint to the state-law claims. Id. Under this rule, a case will not be removable if the complaint does not affirmatively allege a federal claim unless a federal statute so occupies the field that it completely preempts the state-law cause of action. Id. In that instance, the claim is removable under Section 1441(b). Id.

{¶ 87} In 1998, the United States Congress passed SLUSA to establish the federal courts as the "exclusive venue for most securities fraud class actions[s]" involving nationally traded securities. *Burns v. Prudential Secs.* (N.D.Ohio 2000), 116 F.Supp.2d 917, 921, citing H.R.Conf.Rep.No. 803, 105th Cong., 2d Sess. at 13 (1998). SLUSA explicitly permits removal of, and therefore completely preempts state court jurisdiction for, "covered class actions" based on state law claims in which plaintiffs allege:

(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or

(B) that the defendant used or employed any manipulative or deceptive device or other contrivance in connection with the purchase or sale of a covered security.

Section 78bb(f)(2), Title 15, U.S.Code. In the absence of allegations meeting these criteria, Congress has declined to confer jurisdiction on the federal courts, and, accordingly, the doctrine of preemption does not apply.

{¶ 88} The record herein reveals that Pickett and PSI removed this case to federal court following the filing of the complaint. The United States District Court for the Northern District of Ohio found, however, that the allegations made by the plaintiffs did not meet the criteria under SLUSA. See *Burns*, 116 F.Supp.2d at 926. The federal district court determined that the plaintiffs had not alleged specific facts giving rise to a strong inference that Pickett acted deceitfully in making the unauthorized reallocations. Id. At most, the federal

district court held, the plaintiffs alleged unauthorized trading "which, without more, cannot sustain a claim of securities fraud" and did not implicate SLUSA. Id. The federal district court, therefore, remanded the action to the trial court. Id.

{¶ 89} Following the grant of the plaintiffs' motion for partial summary judgment for breach of contract, conversion, and breach of fiduciary duty, Pickett and PSI once again removed the instant action to federal court on September 9, 2002, the day that trial was scheduled to begin. In this removal and request for dismissal, the appellants asserted that the plaintiffs' remaining claim, that Pickett and PSI violated their continuing fiduciary duties during a period of months after the unauthorized sales by failing to inform them about material facts by making false statements and omissions, now fell squarely within the purview of SLUSA.

{¶ 90} Once again, the federal district court disagreed and found that the crux of the plaintiffs' complaint was that Pickett acted on his own, without prior approval, in the sale of their investments. *Burns v. Prudential Secs., Inc.* (N.D.Ohio 2002), 218 F.Supp.2d 911, 915. It was only *after* the unauthorized sales, plaintiffs alleged, that the appellants failed, in violation of their obligations as fiduciaries, to fully inform the plaintiffs about the situation regarding, among other things, the plaintiffs' right to have the sales reversed. Id. The federal district court found that any of these omissions or false statements were not fraudulent "in connection with" the unauthorized sales because they occurred after the decision to sell had been made. Id. The federal district court determined that the plaintiffs' case herein involved two distinct events: (1) the unauthorized sale of investments by Pickett, which was followed by (2) independent acts on the part of PSI. Id. at 916. Further, the federal district court noted that there was no allegation that there was a common scheme or even that Pickett knew or anticipated that PSI would engage in the alleged misrepresentations or omissions following the unauthorized sales. Id. Accordingly, the federal district court determined that any fraudulent action was not "in connection with" the sale of a covered security as required by Section 78bb(f)(2), Title 15, U.S.Code and remanded the case to the trial court. Id. at 917.

{¶ 91} While this appeal was pending, Picket and PSI removed this action to federal court for a third time. Picket and PSI argued, again, that SLUSA barred the plaintiffs' action. But the federal district court disagreed, and it remanded the matter to this court. *Burns v. Prudential Secs., Inc.* (N.D.Ohio 2006), 450 F.Supp.2d 808.

{¶ 92} After review, we find that the prior cases set out a correct explanation of federal securities fraud law as well as a concise and accurate analysis of the applicability of that law to the plaintiffs' breach of continuing fiduciary duty

claim. We hold, as did the federal district court, that the plaintiffs' claims did not meet the criteria set forth in Section 78bb(f)(2).

{¶ 93} Pickett's sixth assignment of error and PSI's 12th assignment of error are, therefore, overruled.

## PRUDENTIAL ASSIGNMENT OF ERROR NO. IV

The trial court erred by failing to dismiss plaintiffs' punitive damages claims as a matter of law.

## PRUDENTIAL ASSIGNMENT OF ERROR NO. V

The trial court and jury erred by finding malice on the part of Prudential Securities, Inc. ("PSI").

{¶ 94} PSI's fourth and fifth assignments of error relate to the availability of punitive damages in the case sub judice. Specifically, PSI argues that in Ohio, punitive damages are limited to tort actions where actual malice is demonstrated. Accordingly, the plaintiffs' claims of breach of contract and negligent supervision cannot support the award of punitive damages. Further, PSI asserts that the only basis on which the plaintiffs could recover punitive damages is for the breach of fiduciary duty but, as argued previously, because Pickett was a nondiscretionary broker, he did not have broad fiduciary duties. In the event that the plaintiffs' breach of fiduciary duty claim could give rise to the imposition of punitive damages, PSI contends that the plaintiffs did not substantiate, by clear and convincing evidence, malice on the part of PSI, and the jury's award of punitive damages was in error.

{¶ 95} Before any analysis of PSI's arguments can be undertaken, however, we must determine which state's law is applicable to the availability of punitive damages and the burden of proof associated with such damages.

{¶ 96} In 1984, the Ohio Supreme Court formally adopted the Restatement of the Law 2d, Conflicts of Law, which outlines the analysis for determining choice-of-law in a tort action. See *Morgan v. Biro Mfg. Co., Inc.* (1984), 15 Ohio St.3d 339, 341–342, 474 N.E.2d 286. The court outlined the approach as follows:

When confronted with a choice-of-law issue in a tort action under the Restatement of the Law of Conflicts view, analysis must begin with Section 146. Pursuant to this section, a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit. To determine the state with the most significant relationship, a court must then proceed to consider the general principles set forth in Section 145. The factors within this section are: (1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile,

residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 [of the Restatement of the Law of Conflicts] which the court may deem relevant to the litigation.

{¶ 97} Relying on these factors in the case sub judice, we find that Ohio has the most significant relationship to the tort action, despite the applicability of New York law to the breach-of-contract claim. The plaintiffs are domiciled in Ohio, the plaintiffs entered into the business relationship with PSI in Ohio, Pickett worked in an Ohio branch office of PSI, and Pickett effected the reallocation of the plaintiffs' assets from that office in Ohio. Moreover, given that the parties herein have relied upon the law of Ohio, we will apply the law of this state.

{¶ 98} The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct. See *Preston v. Murty* (1987), 32 Ohio St.3d 334, 335, 512 N.E.2d 1174. Accordingly, an award of punitive damages requires something more than a showing of mere negligence. *Leichtamer v. Am. Motors Corp.* (1981), 67 Ohio St.2d 456, 472, 21 O.O.3d 285, 424 N.E.2d 568. The burden of proof shall be upon a plaintiff to establish, by clear and convincing evidence, that the plaintiff is entitled to recover punitive or exemplary damages. R.C. 2315.21(D)(4). The amount of punitive damages to be awarded, however, is an issue for the jury to determine. See *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 556–558, 644 N.E.2d 397.

{¶ 99} The general rule in Ohio is that punitive damages may not be recovered in a breach-of-contract action. *Ketcham v. Miller* (1922), 104 Ohio St. 372, 136 N.E. 145, syllabus. However, under modern rules of pleading, an action for tort may be combined with and arise from the same operative facts as a breach-of-contract action. *Sweet v. Grange Mut. Cas. Co.* (1975), 50 Ohio App.2d 401, 406–407, 4 O.O.3d 399, 364 N.E.2d 38. Therefore, if the facts of the case show an intentional tort committed independently, but in connection with a breach of contract, then punitive damages may be awarded. *R & H Trucking v. Occidental Fire & Cas. Co. of N. Carolina* (1981), 2 Ohio App.3d 269, 272, 2 OBR 298, 441 N.E.2d 816. Under any circumstances, pursuant to R.C. 2315.21, punitive damages are permitted only when the actions or omissions of a defendant demonstrate actual malice, and the plaintiff proves actual damages as a result of those actions or omissions.

{¶ 100} Specific to the action herein, punitive damages may be awarded for breach of fiduciary duty, as for other intentional torts, upon proof of actual or implied malice. *Schafer v. RMS Realty* (2000), 138 Ohio App.3d 244, 302, 741 N.E.2d 155, citing *Dunn v. Zimmerman* (1994), 69 Ohio St.3d 304, 631 N.E.2d

1040. As we have concluded previously herein, when Pickett took control of the plaintiffs' investments and reallocated them, Pickett and PSI assumed "enhanced" fiduciary duties, including the duty to notify the plaintiffs of all of the circumstances of the unauthorized trades and their options relating to those trades. The failure to uphold those duties gave rise to a cognizable claim for breach of fiduciary duty. Accordingly, we find that the award of punitive damages was an available remedy for that breach upon clear and convincing proof of actual or implied malice.

{¶ 101} The next question to consider is whether punitive damages are available to the plaintiffs for their claim of negligent supervision. An award of punitive damages requires something more than a showing of mere negligence, but the law does not per se preclude punitive damages in all negligence actions. See *A. Doe v. First Presbyterian Church (USA)* (1998), 126 Ohio App.3d 358, 367, 710 N.E.2d 367, citing *Stephens v. A–Able Rents Co.* (1995), 101 Ohio App.3d 20, 654 N.E.2d 1315. Rather, key to the recovery of punitive damages in Ohio is a finding of malice, and a claim based on negligence can provide the basis for an award of punitive damages if there is an adequate showing of actual malice. See *Preston*, 32 Ohio St.3d at 335–336, 512 N.E.2d 1174.

{¶ 102} In *Preston v. Murty*, the Ohio Supreme Court attempted to eliminate the confusion generated from the many judicial interpretations defining and describing the behavior that constitutes "actual malice" sufficient to support an award of punitive damages. Id. at 336, 512 N.E.2d 1174. The court determined that "a positive element of conscious wrongdoing is always required." Id. at 335, 512 N.E.2d 1174. The court held that "[a]ctual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." Id. at 336, 512 N.E.2d 1174.

{¶ 103} The Ohio Supreme Court has recognized that "it is rarely possible to prove actual malice otherwise than by conduct and surrounding circumstances." *Davis v. Tunison* (1959), 168 Ohio St. 471, 475, 7 O.O.2d 296, 155 N.E.2d 904. Accordingly, actual malice can be inferred from conduct and surrounding circumstances that may be characterized as reckless, wanton, willful, or gross. *Columbus Fin., Inc. v. Howard* (1975), 42 Ohio St.2d 178, 184, 71 O.O.2d 174, 327 N.E.2d 654.

{¶ 104} PSI asserts that the plaintiffs did not establish sufficient proof of malice to support the jury's finding of malice and the subsequent award of punitive damages. PSI contends that the facts with which the plaintiffs alleged malice had no legal or factual basis. Particularly, PSI contends that the failure

to advise the plaintiffs that the trades were unauthorized did not constitute malice, because the plaintiffs were promptly notified of the trades and "obviously knew that they had not authorized them." PSI also asserts that the failure to inform the plaintiffs that PSI would reverse the trades at its own cost did not constitute malice because clients were free to ask who would pay to reverse the trades and until a client did so, the issue of who would pay was irrelevant. Witness testimony at trial further established, PSI asserts, that PSI did not engage in a "cover up" of Pickett's actions.

{¶ 105} In the case sub judice, by way of interrogatories, the jury was asked to determine the following:

Do you find by clear and convincing evidence that the defendant, Prudential Securities, Inc., acted with malice toward the plaintiff class in breaching its fiduciary duty?

Do you find by clear and convincing evidence that the defendant, Prudential Securities, Inc., acted with malice toward the plaintiff class in its negligent supervision of Mr. Pickett and/or other employees?

{¶ 106} The jury answered both questions affirmatively, thereby demonstrating that it found, by clear and convincing evidence, that PSI's actions demonstrated malice and were sufficient to warrant an award of punitive damages. Clear and convincing evidence is that evidence that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 53 O.O. 361, 120 N.E.2d 118. Clear and convincing evidence will be found, as a matter of law, when the record does not demonstrate a sufficient conflict in the evidence. Id. at 479, 53 O.O. 361, 120 N.E.2d 118.

{¶ 107} In support of the jury verdict, the plaintiffs argue that PSI's actions in the days and months following Pickett's reallocations of his customer accounts reflected a pattern and practice of conscious disregard for the rights of the plaintiffs. The plaintiffs specifically point to PSI's sponsorship of the November 12, 1998 seminar, where the plaintiffs were led to believe that the market was about to crash. Meanwhile, PSI was representing to its other clients that it was a good time to buy into the market, a claim substantiated by PSI's market analysts and economists. Additionally, the plaintiffs point to PSI's other conduct after the trades in failing to pay for the reversal of the trades for the one client who requested it; failing to notify that client that PSI's practice was to reverse unauthorized trades at no cost to the client; filing a false report with the Securities and Exchange Commission on November 18, 1998 that stated Pickett was not under any type of internal review for violating "investment related statutes, regulations, rules or industry standards of conduct" when, on the same day, general counsel for PSI had indicated that he wanted Pickett terminated;

contravening the rules and requirements of the New York Stock Exchange by failing to promptly report Pickett's actions and, instead, waiting until March 17, 1999, after Pickett had been terminated, to report his unauthorized trading; ordering all records regarding the complaints from Pickett's clients to be sent to the corporate office in New York without retaining any copies at the local level, contrary to normal procedure; failing to respond to the clients' concerns and ignoring the pleas of the brokers who took over Pickett's accounts to find a resolution to the clients' situation; and failing to provide any advice to the plaintiffs that would have enabled them to properly exercise their rights following the unauthorized trades.

{¶ 108} Further, the plaintiffs contend that PSI was aware of the probability of substantial harm to the plaintiffs. The plaintiffs assert that PSI's observation of the rising stock market in the months following the reallocations demonstrated knowledge of the losses that the plaintiffs were incurring by being out of the market. In addition, the plaintiffs point to the testimony of Thomas Farley, a divisional officer for PSI in 1998, to substantiate the fact that PSI was aware of the harm to the plaintiffs. Specifically, Farley testified at trial that in the months following the unauthorized trades, PSI had compiled a one-page document examining the economic impact of Pickett's conduct and the cost to reverse the trades over different periods of time.

{¶ 109} In applying the applicable law to the instant case, we do not find that the evidence regarding the actions taken by PSI, which were related to, and consequences of, Pickett's initial unauthorized acts, supports a finding by clear and convincing evidence as to hatred, ill will, or a spirit of revenge under the first standard announced in *Preston* for determining actual malice. See *Preston*, 32 Ohio St.3d at 335, 512 N.E.2d 1174. However, we do find that the evidence, if believed by the jury, could have been construed as evidence of actual malice under the second prong of the Preston test.[13] Therefore, we hold there was clear and convincing evidence introduced from which the jury could conclude that PSI's actions following the unauthorized trades demonstrated a conscious disregard for the rights and safety of the plaintiffs that had a great probability of causing substantial harm to the plaintiffs and, hence, that PSI acted with actual malice.

{¶ 110} PSI's fourth and fifth assignments of error are overruled.

---

13. See, e.g., *Cappara v. Schibley* (1999), 85 Ohio St.3d 403, 709 N.E.2d 117 (finding that defendant's fleeing the scene of an automobile accident and his subsequent failure to disclose his involvement in the accident were evidence that could be used to establish an award of punitive damages); *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 635 N.E.2d 331 (holding that subsequent act of destroying and falsifying medical records was sufficient to prove actual malice).

PRUDENTIAL ASSIGNMENT OF ERROR NO. VI

The $250 million punitive award violates PSI's Due Process rights and requires a new trial or drastic remittitur.

{¶ 111} PSI contends, in its sixth assignment of error, that even if there was sufficient evidence of malice to support the availability of punitive damages, the severity of the $250 million award by the jury is violative of PSI's constitutional right to due process pursuant to the Fourteenth Amendment to the United States Constitution.

{¶ 112} In 1996, the United States Supreme Court decided *BMW of N. Am. v. Gore* (1996), 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, in which a plaintiff was awarded $4 million in punitive damages for BMW's failure to disclose that, prior to delivery, the plaintiff's automobile had been repainted after being damaged. The court noted that states necessarily have "considerable flexibility" in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. *BMW*, 517 U.S. at 568, 116 S.Ct. 1589, 134 L.Ed.2d 809. Further, states afford a jury similar latitude and require only that the damages awarded be "reasonably necessary to vindicate the state's legitimate interests in punishment and deterrence." Id. Only in the event that a punitive damage award can be classified as "grossly excessive" in relation to the state's interests is the award considered arbitrary and a violation of the Due Process Clause of the Fourteenth Amendment. Id.

{¶ 113} In order to avoid grossly excessive or arbitrary punishments of a tortfeasor, the court in *BMW* established three guideposts for courts to consider when reviewing an award of punitive damages. Id. at 575, 116 S.Ct. 1589, 134 L.Ed.2d 809. The court stated the three guideposts as follows: (1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Id. The court recently reaffirmed the use of these guideposts in *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003), 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585, which involved a bad-faith claim against the insurer, and held that reviewing courts must conduct a de novo review of a trial court's application of the three *BMW* guideposts to a jury's punitive damage award.

{¶ 114} In the case sub judice, PSI asserts that the punitive damage award in this case fails when analyzed under the three guideposts. Further, because the only harm suffered by the plaintiffs was economic, PSI argues that the punitive award cannot survive review at all and that the compensatory award is "complete compensation" for the plaintiffs.

{¶ 115} The first guidepost, degree of reprehensibility, reflects the accepted view that some wrongs are more blameworthy than others. Id. at 576, 116 S.Ct. 1589, 134 L.Ed.2d 809. For example, nonviolent crimes are less serious than crimes involving violence or the threat of violence, and "trickery and deceit" are thought to be more reprehensible than negligence. Id. In *BMW*, the court determined that none of the aggravating factors associated with particularly reprehensible conduct were present because the harm inflicted on the plaintiff was purely economic. Id. However, the court noted that economic injury can "warrant a substantial penalty" under certain circumstances, namely, when the infliction of an economic injury is "done intentionally through affirmative acts of misconduct * * * or when the target is financially vulnerable." Id., citing *TXO Prod. Corp. v. Alliance Res. Corp.* (1993), 509 U.S. 443, 453, 113 S.Ct. 2711, 125 L.E.2d 366.

{¶ 116} The court in *State Farm* explained further:

"The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575, 116 S.Ct. 1589 [134 L.Ed.2d 809]. We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. Id. at 576–577, 116 S.Ct. 1589 [134 L.Ed.2d 809]. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. Id. at 575, 116 S.Ct. 1589 [134 L.Ed.2d 809].

*State Farm*, 538 U.S. at 419, 123 S.Ct. 1513, 155 L.Ed.2d 585.

{¶ 117} PSI asserts that its conduct falls short of the kind of reprehensibility that could support a large punitive damages award. Specifically, it asserts that the harm caused was purely economic; the claims had nothing to do with health and safety; the claims against PSI did not involve recidivist conduct but represented an isolated instance of unauthorized trading; there was no cover-up and no deception; and the plaintiffs were not a class of financially vulnerable individuals. Moreover, PSI asserts that the reallocations did not deprive the

plaintiffs of any value. Rather, Pickett's actions were intended to make the plaintiffs less financially vulnerable, PSI argues.

{¶ 118} In contrast, the plaintiffs assert that, according to the evidence, PSI illegally sold the investments of approximately 250 senior citizens; sponsored a deceptive seminar to deceive the plaintiffs about market conditions; conducted a prolonged, flawed, and unrecorded investigation of the unauthorized trades; failed to file reports of Pickett's conduct with the New York Stock Exchange and filed false reports; ordered records sent from the local office, which retained no copies, to the corporate headquarters with such records never being located thereafter; and delayed relief for the plaintiffs until the class action was filed; and then attempted to unilaterally negotiate reduced ex parte settlements with Pickett's clients.

{¶ 119} Applying the factors to determine reprehensibility, as explained in *State Farm*, we find that three of the five factors weigh in favor of the plaintiffs. It is acknowledged that the harm caused was economic and did not involve a disregard for the health or safety of others. However, as the trial court determined, the plaintiffs did possess a certain fundamental economic vulnerability. Although many of the plaintiffs may have had accounts in the hundreds of thousands of dollars, that alone does not indicate that they were particularly savvy or sophisticated investors. This fact merely indicates that they had accumulated significant retirement accounts, which they entrusted to the care of Pickett and PSI. Moreover, those retirement accounts and any income they generated were for the purpose of sustaining the plaintiffs for the rest of their lives. As Pickett stated at trial, "When you're retired, these are assets that you've accumulated during your working years. And if you sustain severe losses, you can't replace them." The reverse, however, is also true. If the plaintiffs are not in the stock market at a time when they can take advantage of favorable conditions, they have lost an opportunity to increase the value of their accounts and may never get that opportunity back. The evidence demonstrates that had the plaintiffs continued with their chosen investment scheme, their investments would have increased in the months following October 1998.[14] Accordingly, Pickett's reallocations caused the plaintiffs to lose that increase in value that would have occurred. Moreover, the evidence demonstrates that PSI's actions following the unauthorized trades further delayed the plaintiffs from making an informed decision about whether to reenter the market and attempt to recoup their losses.

---

14. It should be noted, however, that if the plaintiffs had stayed in their preallocation investments until the time of trial, they would have sustained losses. Ken Vincent, one of the brokers who took over Pickett's client accounts, testified at trial that, in his opinion, the plaintiffs would have been better off if they had continued in Pickett's reallocation scheme.

{¶ 120} Second, PSI's conduct cannot be categorically classified as an isolated incident. Although Pickett's unauthorized liquidation of the plaintiffs' accounts constituted a single event, PSI's conduct of withholding information about the trades from the plaintiffs could be categorized as repeated actions. The evidence reflected that over the course of several months, Pickett's clients requested information on the trades that had been made. During that time, PSI was investigating the matter internally but did not take any steps to reveal that Pickett's actions were improper, and it disregarded company policy to reverse the unauthorized trades at PSI's own expense in the face of increasing loss to the plaintiffs each day the matter went unresolved.

{¶ 121} Third, according to the jury verdict, the harm to the plaintiffs was the result of malice and not mere accident. Additionally, as the plaintiffs point out, PSI's conduct caused harm to approximately 250 to 300 people rather than a single individual.

{¶ 122} The second guidepost a court is to consider when reviewing a punitive damage award is the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award. *BMW*, 517 U.S. at 580, 116 S.Ct. 1589, 134 L.Ed.2d 809. In other words, punitive damages must bear a "reasonable relationship" to the harm that was likely to result from the defendant's conduct as well as the harm that actually occurred. Id.

{¶ 123} Courts have, however, consistently rejected the idea that the constitutional line can be marked by a mathematical formula even when the formula compares actual and potential damages to the punitive award. Id. at 582, 116 S.Ct. 1589, 134 L.Ed.2d 809. Still, the jurisprudence of the United States Supreme Court demonstrates that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513, 155 L.Ed.2d 585. Further, the court has held that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. Id., citing *Pacific Mut. Life Ins. Co. v. Haslip* (1991), 499 U.S. 1, 23, 111 S.Ct. 1032, 113 L.Ed.2d 1.

{¶ 124} The United States Supreme Court has recognized that these ratios are not binding, but only instructive and, because there is no "bright line rule," higher ratios might not violate due process, depending on the circumstances of each case. On some occasions, low awards of compensatory damages may properly support a higher ratio than high compensatory awards if, for example, a particularly egregious act results in only a small amount of economic damages. *BMW*, 517 U.S. at 582, 116 S.Ct. 1589, 134 L.Ed.2d 809. Likewise, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to

the compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513, 155 L.Ed.2d 585.

{¶ 125} PSI asserts that the punitive damage award, for ratio purposes, should be measured against the compensatory damages award on the tort action alone on the basis that punitive damages are not available in contract actions. In the case sub judice, the plaintiffs were awarded $12.3 million total in compensatory damages, but the jury apportioned only $6 million to the actual harm caused by the tort. Accordingly, PSI contends that the ratio between the $250 million punitive damage award and the approximate $6 million compensatory award for breach of fiduciary duty and negligent supervision is 40 to one. The plaintiffs, on the other hand, argue that the ratio should be measured against the *entire* $12.3 million compensatory damage award, which results in a ratio of 20 to one.

{¶ 126} It is elemental Ohio law that punitive damages may be awarded for actions constituting a tort but not for breach of contract. *Ketcham,* 104 Ohio St. 372, 136 N.E. 145, syllabus. In cases establishing both breach of contract and tortious conduct, punitive damages may be awarded on account of the independent tortious conduct, " 'the allowance of such damages being for the tort and not for the breach of contract.' " *Saberton v. Greenwald* (1946), 146 Ohio St. 414, 426, 32 O.O. 454, 66 N.E.2d 224, quoting 25 Corpus Juris Secundum (1946), Damages, Section 120; *R & H Trucking,* 2 Ohio App.3d 269, 2 OBR 298, 441 N.E.2d 816, paragraph two of the syllabus.

{¶ 127} The jury in the present case determined the actual damages for the tortious conduct to be $5.9 million. Following the well-established rule in Ohio that punitive damages are available only for tortious conduct, we determine that the punitive damage award should be measured against the compensatory award for those claims only. The jury's award of $250 million in punitive damages compared with the $6 million of compensatory harm that occurred from the tortious conduct results in a ratio of 40 to one.

{¶ 128} Regardless of whether the ratio is calculated on the basis of the actual damages the jury allocated to the tortious conduct alone (40 to one ratio), or on the "harm that ensued when the wrongful conduct succeeded" as represented by the amount of contract damages the jury awarded (20 to one ratio), it is clear that the ratio exceeds by a very significant degree the single digit marker across which, the United States Supreme Court has determined, few awards can survive due process. See *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513, 155 L.Ed.2d 585.

{¶ 129} The plaintiffs assert that any remittitur must be resolved in the appropriate context of a class action. Despite the immensity of the $250 million punitive damage award at first glance, the plaintiffs maintain that it must be considered in the context that, individually, each plaintiff will only be awarded

approximately $833,333 in punitive damages. But considering the damage award in the context of a class action does not alter the fact that the ratio of the punitive damages to compensatory damages in this case is exceedingly large, whether measured in the aggregate for the class as a whole or for each individual separately. Therefore, the distinction that the plaintiffs set forth is inconsequential.

{¶ 130} In determining the proper punitive damages ratio, it is illustrative to consider ratios in other cases as a matter of comparison. In *DeRance, Inc. v. PaineWebber Inc.* (C.A.7, 1989), 872 F.2d 1312, a charitable foundation brought suit against a futures commission merchant and an individual broker for breach of contract, fraud, and breach of fiduciary duty in connection with the merchant's and the broker's handling of the foundation's gold futures account. The foundation was awarded $7.7 million in compensatory damages and $20 million in punitive damages, a ratio of approximately three to one. Id. at 1319. The appeals court found that conduct such as the defendants' was serious, because it shakes people's faith in the market and their ability to rely upon investment advisors, and that such conduct demanded heavy punishment. Id. at 1328. However, the court determined that despite the defendants' need to be punished, the punitive damage award was excessive under the law of Wisconsin, and the court reduced the punitive award to $7 million, resulting in a ratio of approximately one to one. Id. at 1330.

{¶ 131} In the Tenth Circuit Court of Appeals, a plaintiff brought an action against a brokerage firm alleging fraud, deceit, and intentional infliction of emotional distress for a broker who conducted transactions at the direction of the plaintiff's husband on an account that was solely in the plaintiff's name. *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (C.A.10, 1981), 703 F.2d 1152. The plaintiff was awarded $1 million in compensatory damages and $3 million in punitive damages, which results in a ratio of three to one. Id. at 1157. Applying Colorado law, the court noted that while ratios as high as six to one had been sustained, the $3 million punitive damage award was excessive and unwarranted under the circumstances of the particular case, even in light of the defendant's $106 million net worth.[15]  Id. at 1177–1178.

---

**15.**  See, however, an Eighth Circuit case in which the appellate court, relying on the law of South Dakota, upheld a punitive damage award that was 20 times the award of compensatory damages. *Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (C.A.8, 1990), 906 F.2d 1206. In *Davis*, a broker was found liable for violations of the Securities Exchange Act, common-law fraud, and breach of fiduciary duty. Although the court of appeals noted that the award was admittedly higher than the ratios of most other punitive damages awards upheld in South Dakota, it believed that the twenty-to-one ratio was within the permissible range since the Supreme Court of South Dakota had repeatedly held that there was no precise mathematical ratio between compensatory and punitive damages. Id. at 1224.

{¶ 132} Although these cases do not reflect identical fact patterns, they are instructional as to the bounds of a punitive damage award.

{¶ 133} The final guidepost that a reviewing court is to consider is the difference between the punitive damage award and the civil penalties authorized by law. A reviewing court should accord substantial deference to legislative judgment concerning appropriate sanctions for the conduct at issue. *BMW*, 517 U.S. at 583, 116 S.Ct. 1589, 134 L.Ed.2d 809.

{¶ 134} The maximum penalty authorized by the Ohio legislature for securities violations is $20,000. See R.C. 1707.99. The plaintiffs, however, argue that this is not the only penalty that PSI could have been subject to. Pursuant to the federal Exchange Act, PSI could have been subject to censure, had their operations limited or suspended for up to a year, and had the registration of brokers and dealers revoked as a consequence of their actions. See Section 78o(b)(4), Title 15, U.S.Code.

{¶ 135} After careful review, we find that the $250 million punitive damage award is "grossly excessive" when analyzed under the three guideposts set out by the United States Supreme Court in *BMW*. Although PSI's actions certainly evince a degree of reprehensibility, upon consideration of the significant compensatory damage award, the relative egregiousness of PSI's conduct compared to that of other defendants in other cases, and the available civil penalties for such conduct, we find that the circumstances do not rise to the level in which a punitive damage award of $250 million is appropriate.

{¶ 136} Accordingly, we find that the $250 million punitive damage award violates the Due Process Clause of the Fourteenth Amendment.

{¶ 137} PSI's sixth assignment of error is sustained.

## PRUDENTIAL ASSIGNMENT OF ERROR NO. VII

The punitive award violates the Ohio Constitution and requires a new trial or drastic remittitur.

## PRUDENTIAL ASSIGNMENT OF ERROR NO. VIII

The punitive award violates Ohio's limits on punitive damages and requires a new trial or drastic remittitur.

{¶ 138} In addition to being violative of its right to due process under the United States Constitution, PSI asserts in its seventh and eighth assignments of error that the punitive damage award violates Section 16, Article I of the Ohio Constitution, which ensures that verdicts must comport with "due course of law." Accordingly, PSI argues that the trial court erred in denying its motion for a new

trial or ordering remittitur. Having determined that the punitive damage award was excessive under the federal Due Process Clause, we now determine whether the award violates the state Constitution.

{¶ 139} In Ohio, it has long been held that the assessment of damages is so thoroughly within the province of the jury that a reviewing court is not at liberty to disturb the jury's assessment absent an affirmative finding of passion and prejudice *or* a finding that the award is manifestly excessive. See *Toledo, Columbus & Ohio River RR. Co. v. Miller* (1923), 108 Ohio St. 388, 402–403, 140 N.E. 617. The trial judge is in the best position to determine whether an award is so excessive as to be deemed a product of passion or prejudice, and the trial court's determination on that issue will not be disturbed absent an abuse of discretion. *Fromson & Davis Co. v. Reider* (1934), 127 Ohio St. 564, 569, 189 N.E. 851; see, also, *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 655, 635 N.E.2d 331. On review to determine whether a punitive damage award is excessive, the award will not be overturned unless it bears no rational relationship or is grossly disproportionate to the award of compensatory damages. *Shore, Shirley & Co. v. Kelley* (1988), 40 Ohio App.3d 10, 16, 531 N.E.2d 333.

{¶ 140} In determining the proper amount of a punitive damage award in Ohio, the Ohio Supreme Court has found the three guideposts announced in *BMW* to be effective guidance. See *Dardinger v. Anthem Blue Cross*, 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E.2d 121, at ¶ 152; *Wightman v. Consol. Rail Corp.* (1999), 86 Ohio St.3d 431, 439–440, 715 N.E.2d 546. The court has also stated that "a punitive damages award is more about defendant's behavior than the plaintiff's loss." *Wightman*, 86 Ohio St.3d at 439, 715 N.E.2d 546. The court further explained:

> The focus of the award should be the defendant, and the consideration should be what it will take to bring about the twin aims of punishment and deterrence as to that defendant. We do not require, or invite, financial ruination of a defendant that is liable for punitive damages. While certainly a higher award will always yield a greater punishment and a greater deterrent, the punitive damages should not go beyond what is necessary to achieve its goals. The law requires an effective punishment, not a draconian one.

*Dardinger* at ¶ 178.

{¶ 141} Ohio jurisprudence reveals that the largest punitive damages award to come before the Ohio Supreme Court for review was an award of $49 million against Anthem Blue Cross & Blue Shield. In that case, *Dardinger*, the executor of his wife's estate, brought an action against Anthem and its parent corporation to recover for breach of contract and bad-faith denial of a claim for chemotherapy to treat his wife's brain tumors. Dardinger asserted that the way the defendants

handled his wife's chemotherapy needlessly shortened her life and caused her last days to be more painful than they should have been. The jury awarded Dardinger $2.5 million in compensatory damages on the bad-faith claim and $49 million in punitive damages.

{¶ 142} Prior to *Dardinger,* the largest punitive damages award before the court had been $15 million. See *Wightman,* 86 Ohio St.3d at 445, 715 N.E.2d 546. In *Wightman,* a Consolidated Rail Corporation freight train collided with a car driven by Michelle Wightman, killing her and her passenger. Michelle's mother, as administrator of her daughter's estate, sued the railroad for wrongful death and, on her own behalf as owner of the car Michelle was driving, for the destruction of her automobile. Id.

{¶ 143} The *Dardinger* court reduced the $49 million punitive damage award on the basis of *Wightman.* It found that the $49 million award, which was over three times the award in *Wightman,* was excessive. *Dardinger* at ¶ 183. The court recognized that the $15 million award in *Wightman* had been sufficient to punish the railroad and looked to the principles established in *Wightman* to determine an award that would sufficiently punish Anthem and spur them to change their practices in handling claims. Id. at ¶ 179. The court calculated that the $49 million award had represented one-fourth to one-third of the annual net profits of Anthem's parent company. Id. at ¶ 180. Although the court stated that this fraction would not always be excessive, it opined that a figure that equaled one-sixth of the defendant's annual net earnings was more in line with the history of punitive damage awards in Ohio. Id. at ¶ 185. The *Dardinger* court, therefore, ordered remittitur of $19 million, to reduce the award to $30 million. Id. at ¶ 186. We note that this resulted in a punitive damages to compensatory damages ratio of 12 to one.

{¶ 144} Of significance in the *Dardinger* analysis of the reasonableness or excessiveness of an award of punitive damages is the comparison to the defendant's annual net earnings. In this case, however, it is not disputed that no income or earnings statements were introduced into evidence.

{¶ 145} PSI contends, nevertheless, that PSI's net income can be extrapolated from the documents showing annual changes in shareholder equity that are in evidence by virtue of Plaintiff's Exhibit 136–I. However, there is no testimony, expert or otherwise, in the record providing an explanation of the proper method or basis for accomplishing this extrapolation, its reliability, or its accuracy. Nor is there any testimony about the effect of the lack of information regarding any dividends paid by PSI to its parent corporation. Absent such testimony, we do not see how accurate conclusions can be drawn, particularly by those untrained in the rigors of accounting techniques. The result is that we are left only to

speculate as to both PSI's annual net income and profits, which, of course, we may not and will not do.

{¶ 146} Similarly, there is no reliable evidence before this court regarding PSI's net worth. Net worth can be a proper factor in analyzing the reasonableness or excessiveness of a punitive damage award where sufficient evidence of net worth is in the record. The only evidence material to this fact introduced at trial concerns PSI's assets under management. However, the evidence of PSI's assets under management comprises, or at least includes, money owned by PSI's clients. There is no evidence as to what portion of the funds, if any, are owned by PSI. Consequently, the state of the evidence would require us, as it would have the jury, to speculate about PSI's net worth. Without the proper evidentiary basis, we are also unable to consider PSI's net worth in our analysis of the punitive damage award.

{¶ 147} It is clear that the $250 million punitive damage award herein is approximately five times the largest punitive award encountered by the Ohio Supreme Court and approximately eight times the largest award allowed by that court. Moreover, we cannot ignore that the facts of this case are in stark contrast to those in *Dardinger* and *Wightman,* which involved physical injury, pain, and death. Therefore, although we note that the *Wightman* and *Dardinger* opinions offer sound guidance as to the appropriateness of punitive damage awards in cases involving significant physical injury and psychological pain, in determining the amount of punitive damages that will adequately punish a defendant who has inflicted economic harm only, we must look, additionally, to other Ohio cases.

{¶ 148} PSI asserts that the largest punitive damage award for economic harm was $4 million. See *Regal Cinemas v. Wolstein* (N.D.Ohio 2001), 2001 WL 1689683. In that case, a real estate developer fraudulently induced the plaintiff into a lease agreement with the knowledge that permits necessary for construction could not be obtained as quickly as promised. Id. The jury awarded $5 million in compensatory damages and $4 million in punitive damages. Id.

{¶ 149} Admittedly, the $4 million award that PSI cites is the largest punitive damage award for economic harm in Ohio that this court has found. However, we believe that this case is illustrative, most importantly, not for the amount of punitive damages awarded but for the recognition that a significant punitive damage award will, under certain circumstances, be necessary to adequately punish the defendant. In studying this concept further, we look to other cases involving predominantly economic harm, albeit involving factually different scenarios than the one herein.

{¶ 150} In an action for malpractice and conversion initiated by a divorce client against her former attorney, the Tenth District Court of Appeals upheld a punitive damage award of $75,000, which was 13 times the $5,500 amount awarded for compensatory damages. *Bauer v. Georgeff* (Sept. 1, 1998), 10th Dist. No. 97APE03–313, 1998 WL 614636, at *3. The court concluded that the attorney's degree of reprehensibility was high since he ignored both his fiduciary and ethical obligations to his client, and the exemplary damages reflected "the enormity of his offense." Id. at *7.

{¶ 151} In an action for wrongful termination of employment on the grounds of racial discrimination, the Eighth District Court of Appeals determined that a punitive damage award of $500,000 was not excessive when the plaintiff received $100,000 in compensatory damages, because the punitive damage award served a significant deterrent function. *Griffin v. MDK Food Serv., Inc.*, 155 Ohio App.3d 698, 2004-Ohio-133, 803 N.E.2d 834, at ¶ 49, 57.

{¶ 152} This court has previously determined that a punitive damage award of $6 million was not excessive in a case involving the death of one motorist and injury to another when a train struck the vehicle the two men were riding in at a railroad crossing. See *Gollihue v. Consol. Rail Corp.* (1997), 120 Ohio App.3d 378, 697 N.E.2d 1109. In *Gollihue*, the plaintiffs brought claims for wrongful death, personal injury, and property damage to recover damages for the railroad's failure to properly maintain the signals at the crossing. Id. at 384, 697 N.E.2d 1109. The jury awarded one of the plaintiffs $2 million in compensatory damages and $6 million in punitive damages, a three-to-one ratio, which the railroad appealed as being excessive and a violation of due process. Id. at 385, 697 N.E.2d 1109.

{¶ 153} We determined that the $6 million award in *Gollihue* was not excessive, especially considering the loss of life resulting from an inadequately protected railroad crossing and the potential for harm in the event the defendant did not change its practices. Id. at 403, 697 N.E.2d 1109. Further, the $6 million award represented only one week's net profit for the railroad company, and we concluded that the award was not disproportionate to its deterrent effect. Id.

{¶ 154} These cases, and their respective punitive damage awards, are vastly different from each other. However, they each stress that an award of punitive damages should serve the purposes of punishing the defendant for its improper conduct and deterring others from engaging in the same conduct. Applying these principles to the case sub judice, we note several facts that we find are particularly important to the determination of the propriety of the punitive damage award herein.

{¶ 155} The evidence reveals that the initial unauthorized handling of the accounts was not driven by Pickett's affirmative effort to defraud the account

holders. There was no "churning" of the accounts for the purpose of inflating commissions or otherwise increasing the profits of Pickett or PSI, and no conversion of client funds for the purpose of theft. In fact, although Pickett's decision to liquidate his clients' accounts was contrary to his contractual and fiduciary obligations, the parties do not dispute that Pickett was motivated by a desire to protect his clients' investments. While the clients stood to lose any increase in the value of their investments as a result of Pickett's action, the principal of the accounts was never in jeopardy.

{¶ 156} After the unauthorized transactions were completed, however, PSI engaged in a course of action that can fairly be classified as a cover-up. Although the record does not specifically reveal the reason why PSI took such action, there exist several plausible explanations. Undoubtedly, PSI would not have wanted the publicity that would be the result of the news that one of its brokers had liquidated the accounts of approximately 300 clients without those clients' permission. Further, PSI would have wanted to protect itself from the loss it would sustain if the account holders realized their right to have PSI reverse the unauthorized transactions and reinstate the account holders into the market at PSI's expense. While PSI's continued attempt to cover up Pickett's unauthorized trades was certainly reprehensible, it did not jeopardize the principal sum of each client's account. The clients' risk of loss continued to be limited to the lost opportunity of the benefits that could result from a rising stock market.

{¶ 157} There is no evidence in the record that it was a corporate policy of PSI to engage in such a cover-up in the event of an unauthorized transaction. Rather, PSI employees testified that it was PSI's practice to reverse unauthorized trades at a client's expense. It can only be surmised that the reason this policy was not followed in the present case was the volume of transactions made and the sizable loss that PSI would have incurred to reverse those transactions. In any event, the evidence revealed ad hoc actions by PSI that, while inexcusable and tortious, did not establish a pattern of conduct regularly engaged in as a matter of corporate policy.

{¶ 158} The purpose of punitive damages is to punish a defendant for conscious wrongdoing and to deter future conduct of like nature. *Dardinger*, 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E.2d 121, at ¶ 178. In considering this purpose in the present case, it is instructive to examine the potential loss that motivated PSI to cover up Pickett's actions.

{¶ 159} The evidence established that it would have cost PSI $665,034 to reverse the unauthorized transactions on October 9, 1998, the day after the trades were completed. We acknowledge, however, that PSI may not have known at that time that the transactions were unauthorized. One week after the transactions, however, PSI had sufficient information to reach that conclusion. At that

point, the cost to PSI to reverse the trades would have been $3,425,593. Considering that PSI directed its employees to stonewall, misrepresent, and wrongfully conceal from the clients essential information in order to avoid a $3.5 million loss, it is evident that a sum substantially less than $250 million was sufficient motivation to direct PSI's conduct.

{¶ 160} After review, we find that the $250 million punitive damage award is contrary to established precedent under Ohio law. We do not find that the verdict was the result of passion or prejudice. In awarding an extremely substantial punitive damage award, the jury no doubt was considering the large number in the plaintiff class and the systematic misrepresentations made to that class by PSI. As the trial court noted, the entire case was unique, "being a class action against a larger national corporation with enormous assets, which utilized intentionally deceptive practices against a class whose members were unusually vulnerable." Accordingly, we believe that these concerns were in the mind of the jury when it calculated the punitive damage award.

{¶ 161} Nonetheless, in light of established precedent and the additional, legal factors that we are required to consider, we conclude that the jury's award was excessive. It far exceeds the largest punitive damage verdict allowed by the Ohio Supreme Court in a case which involved significant physical pain and suffering. Additionally, we find that the award is grossly disproportionate to the nearly $6 million in compensatory damages that the jury awarded the plaintiffs on the tort claim.

{¶ 162} Considering that the harm herein was wholly economic and did not involve health and safety issues, that the compensatory damages awarded by the jury can be said to fully compensate the plaintiffs, that none of the principal of the plaintiffs' funds was ever in jeopardy, that the cover-up was not shown to be a general corporate policy, and that there was no reliable evidence as to defendant PSI's net worth or annual net profits, we conclude that a punitive damage award of $6,851,186 is an amount reasonably sufficient to both punish the defendant and to deter future such conduct by the defendant and others.

{¶ 163} In reaching our decision, we give strong consideration to the fact that PSI's conduct was influenced by the looming loss of the nearly $3.5 million it would have cost PSI to reverse the unauthorized trades within a week following the transactions. If this sum of money was sufficient to lead PSI away from its duty to restore its clients to their positions prior to the unauthorized transactions, then it is reasonable to conclude that a similar sum would also be effective to deter PSI from abandoning its duties.

{¶ 164} Punitive damages are not about compensating plaintiffs. That is the purpose of a compensatory award (of over $12 million in this case). The focus of the punitive award, rather, is on the defendant and "what it will take to bring

about the twin aims of punishment and deterrence." *Dardinger*, 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E.2d 121, at ¶ 178.

{¶ 165} We conclude, then, that by doubling the amount of money that prompted PSI to undertake its cover-up, the dual purposes of deterring similar conduct in the future by PSI and others and of punishing PSI for its tortious conduct in the present case will be reasonably served. We note that this sum of $6,851,186 represents a ratio of slightly more than 1:1 of compensatory damages (tort) to punitive damages, which is within the constitutional guidelines discussed above.

{¶ 166} Accordingly, we find that a remittitur of $243,148,814 is warranted.

{¶ 167} PSI's seventh and eighth assignments of error are, therefore, sustained.

## PRUDENTIAL ASSIGNMENT OF ERROR NO. X

The trial court's errors and plaintiffs' misconduct before and during trial require a new trial.

{¶ 168} In its tenth assignment of error, PSI asserts that the misconduct of plaintiffs' counsel requires a new trial. PSI contends that the improper conduct of plaintiffs' counsel not only caused an unprecedented punitive award but "undermined the very foundation of the judicial process." Specifically, PSI asserts as error the pretrial publicity that plaintiffs' counsel sought by running an advertisement in the local newspaper to solicit clients for the class action, which stated that Pickett had potentially violated the securities laws; taking advantage of the trial court's denial of PSI's motion to change venue by making repeated references to the class members as the jurors' "neighbors and friends here in Marion"; by failing to fully investigate juror bias and by not agreeing to remove jurors who were relatives and friends of the plaintiffs; and by accusing PSI of criminal conduct and "Enron-like" behavior in closing arguments.

{¶ 169} "Due process requires fairness and a fair trial." *Verbanic v. Verbanic* (1994), 70 Ohio St.3d 41, 44, 635 N.E.2d 1260. Specifically, trial judges have a duty to control trials so that "counsel do not create an atmosphere which is surcharged with passion or prejudice and in which the fair and impartial administration of justice cannot be accomplished." Id. at 43, 635 N.E.2d 1260. When comments or actions of counsel are so egregious as to prejudice the jury and prevent a fair trial, the judgment will be reversed. *Vescuso v. Lauria* (1989), 63 Ohio App.3d 336, 340, 578 N.E.2d 862.

{¶ 170} We have already determined herein that the trial court did not err in denying the motion for a change of venue. Only one juror had seen any

information about the case in the local paper, and that juror stated that what she had read would not affect her deliberations. Therefore, we do not find that pretrial publicity on the part of plaintiffs' counsel prejudiced the jury or prevented a fair trial. We have also determined that the jury was properly impaneled and, therefore, counsel's failure to agree to have certain jurors removed for cause cannot be said to have had a prejudicial effect.

{¶ 171} Regarding the closing arguments as well as comments to the jury about the "close-knit community" and the plaintiffs being the jurors' "friends and neighbors," we note that PSI's counsel did not object to these classifications. "[T]he failure to object to misconduct of counsel at the time it occurs constitutes a waiver of the right to object on review of the case." *Byrd v. Baltimore & Ohio Rd. Co.* (1966), 10 Ohio App.2d 187, 196, 39 O.O.2d 376, 227 N.E.2d 252, citing *Walsh v. J.R. Thomas Sons* (1915), 91 Ohio St. 210, 110 N.E. 454; *Yerrick v. E. Ohio Gas Co.* (1964), 119 Ohio App. 220, 27 O.O.2d 67, 198 N.E.2d 472. Accordingly, these allegations are waived.

{¶ 172} From the evidence presented, neither can we conclude that plaintiffs' counsel created an atmosphere of passion and prejudice that influenced the punitive damage award. We note that the plaintiffs suggested to the jury that a punitive damage award of $1 billion would adequately punish PSI. The jury awarded only one quarter of that figure. Further, the jury was given carefully crafted and detailed interrogatories, which they answered in a complete and logical manner. Moreover, the deliberations of the jury, which lasted for two days, evidenced thoughtful consideration, demonstrated by the fact that the jury submitted several questions to the court during those deliberations.

{¶ 173} After review, we do not find that the conduct of plaintiffs' counsel during the trial deprived PSI of a fair trial or requires that a new trial be ordered.

{¶ 174} PSI's tenth assignment of error is, therefore, overruled.

## PRUDENTIAL ASSIGNMENT OF ERROR NO. XI

The trial court erred by failing to decertify the class.

{¶ 175} In its 11th assignment of error, PSI asserts that the trial court erred by failing to decertify the class action when it became clear at trial that the predominant issue was not whether PSI was liable to its clients for the unauthorized trading of their accounts, but whether PSI was liable to its clients for the interactions in the months that followed the trades. PSI asserts that the determination became individualized because it was important to know what each plaintiff knew, and the class should have been decertified.

**861**

{¶ 176} Civ.R. 23(A) specifies four prerequisites to class actions: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *Warner v. Waste Mgt., Inc.* (1988), 36 Ohio St.3d 91, 96, 521 N.E.2d 1091. In addition, a class action may be maintained if the prosecution of separate actions would lead to inconsistent results or would impair other members' ability to protect their interests, the party opposing certification acts or refuses to act with respect to the class as a whole, or common questions of law and fact predominate over questions affecting individual members. See Civ.R. 23(B)(1), (2), and (3). A trial court has broad discretion in determining whether a class action may be maintained, and such determination will not be disturbed absent a showing of an abuse of that discretion. *Marks v. C.P. Chem. Co.* (1987), 31 Ohio St.3d 200, 31 OBR 398, 509 N.E.2d 1249, syllabus.

{¶ 177} The trial court herein certified the class on February 5, 2001. PSI appealed that certification to this court and we affirmed. *Burns v. Prudential Securities, Inc.* (2001), 145 Ohio App.3d 424, 763 N.E.2d 234. In so doing, we stated:

> Here, there is no question that a great deal of time will be spent determining the amount of liability, if any, for each client. However, the common issue is whether Prudential is liable to any of the clients for its actions. Additionally, the defenses raised by Prudential are based upon the same information sent to all of the clients. This information includes the seminar held, the monthly statements, and the confirmation slips.

Id. at 431, 763 N.E.2d 234. In upholding the trial court's findings on the certification issue, we found that there existed common questions of law and fact arising from "identical form contracts, the identical action of Prudential's agent, the same methods of communication with the clients, and an identical basis for the alleged affirmative defenses." Id.

{¶ 178} These conclusions are still valid. From the evidence adduced at trial, PSI took substantially identical action with regard to each of Pickett's clients. All clients were sent confirmation slips, all clients were sent monthly statements, all clients were invited to a seminar where they were given the same advice about the market, and the information that the trades were unauthorized and that PSI would reverse the trades at its cost was withheld from all clients. Accordingly, the common questions of law and fact continued to predominate at trial.

{¶ 179} Further, as the plaintiffs point out, PSI was aware of the plaintiffs' theory of recovery based on the breach of fiduciary duty as early as September 6, 2002, one week before trial, when the trial court allowed the plaintiffs to pursue

their claim based on PSI's actions "during a period of months after the [reallocations]." This is evidenced by the federal district court's opinion issued September 10, 2002, which denied removal to federal court for the second time. See *Burns*, 218 F.Supp.2d 911. Therein, the federal district court noted that the plaintiffs asserted that their claim was one of breach of a continuing fiduciary duty and that they wished to introduce evidence of misstatements and omissions in relation to events occurring after the unauthorized liquidation of their accounts. Id. at 915. Despite this awareness, however, PSI failed to move the trial court for decertification at any stage of the trial proceedings or in its posttrial motions.

{¶ 180} It is axiomatic that issues not presented for consideration below will not be considered by a reviewing court on appeal. *Shover v. Cordis Corp.* (1991) 61 Ohio St.3d 213, 220, 574 N.E.2d 457; *Foran v. Fisher Foods, Inc.* (1985), 17 Ohio St.3d 193, 194, 17 OBR 430, 478 N.E.2d 998; *Hamlin v. McAlpin Co.* (1964), 175 Ohio St. 517, 26 O.O.2d 206, 196 N.E.2d 781, paragraph one of the syllabus; *Hoffman v. Staley* (1915), 92 Ohio St. 505, 505, 112 N.E. 1084. Therefore, we find that PSI's failure to move to decertify the class waived any objection in this court regarding the maintenance of the class action.

{¶ 181} PSI's 11th assignment of error is, therefore, overruled.

{¶ 182} Having found no error prejudicial to Pickett herein, in the particulars assigned and argued, we affirm the judgment of the trial court against Pickett. Having found error prejudicial to PSI herein, only as to the award of punitive damages as asserted in assignments of error six, seven, and eight, we reverse the judgment of the trial court on that issue and subject the punitive damage award to a remittitur of $244 million or, in the alternative, a new trial in the event the plaintiffs do not agree to accept remittitur. We affirm the judgment of the trial court in all other respects.

Judgment affirmed in part
and reversed in part.

GLASSER, J., concurs.

SHAW, J., concurs in part and dissents in part.

GLASSER, J., retired, of the Sixth Appellate District, sitting by assignment.

SHAW, Judge, concurring in part and dissenting in part.

{¶ 183} I respectfully dissent only as to the final recalculation of the punitive damage award by the majority. At the outset, I concede that the thorough analysis of the prevailing case law in the majority opinion leaves little doubt that even considering the class action status of plaintiffs, the current jurisprudence of

the United States and Ohio Supreme Courts does not support a $250 million punitive damage award in this case. Unfortunately, it seems equally clear that once a punitive award is determined to be excessive, the jurisprudence in this area essentially provides for the appellate courts to unilaterally substitute their own calculation of punitive damages for that of the trial court and jury—with little objective guidance and little or no deference to the trial process or jury verdict. Accordingly, this court now proposes to reduce the overall punitive damage award in this case, for a class of some 300 plaintiffs, from $250 million to about $6 million.

{¶ 184} I find at least two aspects of this appellate remittitur troubling. First, unlike most of the prevailing case law on this subject, our review of the record in this case has resulted in a unanimous determination that there was no error committed at the trial. Moreover, we have made an express determination in our opinion that the verdict and punitive damage award of the jury was not the product of any improper passion or prejudice. Under these circumstances, I believe that sound appellate review, even in this sensitive area, requires some deference to the trial court process and the jury verdict, beyond what the majority proposal reflects. At one time, the Ohio Supreme Court would seem to have agreed with this proposition. See *Wrightman v. Consol. Rail Corp.* (1998), 83 Ohio St.3d 1443, 700 N.E.2d 328.

{¶ 185} Second, while it is true that this case does not present an egregious matter of individual personal injury or death, the case does involve an entire class of some 300 individuals. Thus, the misconduct of the defendants, detailed at length in the majority opinion, clearly exhibited a corporate arrogance, reckless disregard, and indifference to the public interest that in my view, is equally egregious in its own way. Moreover, I respectfully disagree with the reluctance of the majority to characterize this misconduct as reflecting overall corporate policy. The record plainly shows otherwise.

{¶ 186} In particular, I believe that the majority calculation of the final punitive award is unduly influenced by the fairly generous compensatory award received by the plaintiffs, as opposed to consideration of the appropriate punishment for the defendants' misconduct. Simply put, if Prudential was willing to treat 300 of its own clients in the manner established in the record, I believe that the corporate threat to the public interest was real and is undervalued by the majority.

{¶ 187} I concur with the majority in identifying the period of the cover-up following these transactions as the operative period in evaluating the punitive award. And in the absence of clear evidence of corporate worth, I concur with the majority in identifying the cost to Prudential of restoring these accounts during this period as an important financial incentive in continuing the cover-up—

and hence, an important factor for us in considering the appropriate financial punishment.

{¶ 188} However, I respectfully disagree with the majority in selecting the lower cost ($3.5 million) of restoring these accounts one week after discovering the illegal transactions as the base amount for the remitted punitive award, when we have clearly documented, and upheld in our opinion, a compensatory award based upon the highest value of these accounts over the cover-up period, which extended for several months. In my view, it would be more consistent to base the punitive award on the cost of restoring these accounts at their highest point during the period of the cover-up. The trial record indicates that this amount would have been approximately $6.5 million, which incidentally, would have been only three weeks after the date selected by the majority.

{¶ 189} In sum, even assuming the necessity of a drastic remittitur in this case, I believe that the appropriate punitive award would be a multiple of the $6.5 million representing the cost to restore these accounts at their highest point during the cover-up period. In my view, a doubling of this amount for a total punitive award of $13 million would constitute a minimum amount appropriate to these facts. Such an award would be more consistent with our analysis of the remaining issues in the case, and, while perhaps on the high side of existing Ohio case law for purely economic misconduct, it is not so high when applied to corporate misconduct toward a class of 300 plaintiffs, and the two-to-one overall ratio employed in this calculation would comport with the most recent formulas of the Ohio Supreme Court for the reasoned recalculation of excessive punitive damages. See *Dardinger v. Anthem Blue Cross & Blue Shield*, 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E.2d 121.

{¶ 190} Finally, such an award would at least constitute a token gesture of deference to the due process rights of the plaintiffs, who obtained this jury verdict in what we have expressly acknowledged was a fair trial conducted by the trial judge, counsel, and the jury without error, undue passion, or prejudice.

{¶ 191} I concur fully in every other aspect of the majority decision.